**Amy GREENSTONE, and all Others Similarly Situated, Plaintiffs, Appellants,**

v.

**CAMBEX CORPORATION, et al., Defendants, Appellees.**

Nos. 91–2241, 92–1026.

United States Court of Appeals, First Circuit.

Heard June 3, 1992.

Decided Sept. 18, 1992.

Roger W. Kirby with whom Jeffrey H. Squire, Kaufman, Malchman, Kaufmann &

Kirby, New York City, Thomas G. Shapiro, Gretchen Van Ness, and Shapiro Grace & Haber, Boston, Mass., were on brief, for plaintiffs, appellants.

John D. Donovan, Jr. with whom Andrew C. Pickett and Ropes & Gray, Boston, Mass., were on brief, for defendants, appellees.

Before BREYER, Chief Judge, O'SCANNLAIN,* and CYR, Circuit Judges.

BREYER, Chief Judge.

The question on this appeal is whether the appellant's complaint states a claim for fraud under the federal securities laws, 15 U.S.C. § 78j(b), a claim that she must plead "with particularity." Fed.R.Civ.P. 9(b). The district court held that it did not, and it dismissed the complaint. 777 F.Supp. 88. We affirm that decision.

## I

### The Allegations

The plaintiff (and appellant), Amy Greenstone, filed a securities fraud claim against Cambex Corporation and several of its officers. Her complaint, in essence, says (1) that Cambex would sell its Cambex memory boards for use in IBM computers; (2) that it would accept IBM memory boards as "trade-ins;" (3) that a lessor of IBM computers claimed that Cambex's business was unlawful, sued Cambex and won; and (4) that Cambex should have disclosed the threat of such a lawsuit in advance. Her complaint more specifically alleged:

1. Cambex Corporation makes various computer products, including memory boards.

2. In 1989 and 1990 Cambex sold memory boards for use in IBM computers. The Cambex customer would replace the IBM memory board in his IBM computer with a Cambex memory board. Cambex would accept, as a trade-in in part payment for its memory board, the IBM memory board that the Cambex board had replaced. Cambex then would either resell the IBM memory board or lease the IBM memory board to others, thereby obtaining additional revenue.

3. If the Cambex customer had an IBM computer that he had *leased,* rather than bought, Cambex would sometimes return the IBM board to the IBM computer before the customer returned the IBM computer to the IBM computer lessor.

4. In 1989 and 1990 Cambex's financial statements showed significant revenues from this "IBM memory board replacement" activity. During this time Cambex issued other public statements, which said, for example, that its sale of Cambex's "substantially better" memory boards, and resale, or lease, of less desirable IBM memory boards taken as trade-ins, made a "steady contribution to revenues and profits," helped bring about "steadily improving results," helped account for Cambex's "sound performance," and, in general, helped Cambex maintain profits.

5. On Friday, February 1, 1991, IBM Credit (a subsidiary of IBM and a lessor of IBM computers) filed a lawsuit against Cambex. IBM Credit claimed in essence that the terms of its leases prohibited its lessees (and Cambex) from removing IBM's memory boards and selling, or leasing, them to others without IBM Credit's approval.

6. About one month later, Cambex and IBM Credit settled the lawsuit. Cambex agreed to pay IBM about $6 million and "to comply with IBM Credit's terms and conditions of its subleases."

7. Throughout 1989 and 1990 Cambex executives knew that Cambex did not have the legal right to take, and to resell or lease, the IBM memory boards.

8. On January 22, 1991, just before IBM's lawsuit, she bought 500 shares of Cambex stock at a price of $14⅝ per share. About two weeks later, just after the IBM lawsuit became public, she sold the shares at $12⅞ per share, a loss of $1.75 per share, or 12% of the purchase price. During those two weeks, Cambex stock had suddenly climbed to $18 per

---

* Of the Ninth Circuit, sitting by designation.

share, from which height it fell, on the day the lawsuit was announced, to $11¾, closing the day at $13¼ per share.

The complaint goes on to claim, in general terms, that the facts set forth show that Cambex and its officers violated the securities law—law that forbids any person "in connection with the purchase or sale" of securities, to make an

> untrue statement of a material fact or to *omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . .*

17 C.F.R. § 240.10b–5(b) (emphasis added). The complaint argues that Cambex's financial statements, though literally true, were "misleading" in "light of the circumstances under which they were made," for they failed to disclose Cambex's potential legal liability to IBM lessors.

The district court concluded that the complaint did not state an actionable claim because it failed to meet the requirement of Fed.R.Civ.P. 9(b), which says:

> In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity.

The complaint did not set forth "the circumstances constituting fraud . . . *with particularity.*" (Emphasis added). For this reason, it dismissed the complaint. The court also refused to permit the plaintiff to file an amended complaint. She now appeals.

After examining both the complaint and the proposed amended complaint, we conclude that neither sets forth a claim of securities fraud with sufficient particularity. In explaining our conclusion, we shall focus on the proposed amended complaint, which, essentially, reiterates the initial complaint with additional detail. (Our conclusions apply to the initial complaint *a fortiori* ).

## II

### *The Financial Statements*

The complaint lists specific statements that it says mislead by omission. Many of these statements consist of figures, e.g. revenue, income and profit figures, on Cambex's 1989 and 1990 income statements and balance sheets, filed with the SEC in those years. The statements are accurate and could not mislead *unless,* given the circumstances, an investor would normally have expected to find some kind of qualification of the figures, disclosing a significant potential liability. Generally Accepted Accounting Principles, with which the SEC ordinarily requires compliance, set forth rules that govern such disclosures. The kind of potential liability at issue here is

> a loss contingency involving an unasserted claim or assessment when there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment. . . .

Financial Accounting Standards Board Statement No. 5, § 10. The rules say that financial statements need *not* disclose this kind of potential liability *unless:*

> it is considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

*Id.; see* Loss & Seligman, *Securities Regulation* 652–57 (1989) (discussing application of FASB Statement No. 5 to the disclosure of unasserted legal claims); S.E.C. Accounting Release (Dec. 20, 1973) ("[P]rinciples, standards, and practices promulgated by the FASB in its Statements and Interpretations will be considered by the Commission as having substantial authoritative support, and those contrary to such FASB promulgations will be considered to have no such support." (footnotes omitted)); *S.E.C. v. Steadman,* 967 F.2d 636, 645 (D.C.Cir.1992) (considering FASB No. 5 in SEC suit alleging that company failed to disclose contingent liability). Given the kinds of qualifications that investors would necessarily expect financial statements to disclose, we do not see how these financial statements could have materially misled unless, at the time Cambex filed its financial statements, Cambex (and its officers) knew that the future IBM Credit suit was "probable." The question is whether the

complaint alleges specific facts sufficient to support that claim.

▆ *Conclusory Allegations.* The complaint says, in conclusory fashion, (1) that Cambex "knew" that IBM Credit's leases forbade Cambex's memory trade-ins and (2) that the defendants "knowingly or recklessly" published misleading financial statements. Appellant argues that at least the first of these assertions satisfies Rule 9(b), for that rule permits averments of "knowledge" in "general[ ]" terms. Rule 9(b), however, also requires the plaintiff to plead "the circumstances constituting fraud ... with particularity." Fed.R.Civ.P. 9(b). And, one cannot avoid the latter requirement simply through a general averment that defendants "knew" earlier what later turned out badly.

Case law requires a plaintiff to do more. The courts have uniformly held inadequate a complaint's general averment of the defendant's "knowledge" of material falsity, unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading. See, e.g., *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) ("Although scienter need not be alleged with great specificity, plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." (citation omitted)); *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.) ("Although Rule 9(b) does not require 'particularity' with respect to the defendants' mental state, the complaint still must afford a basis for believing that plaintiffs could prove scienter."), *cert. denied,* —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991) ("Although a plaintiff need not specify the circumstances or evidence from which fraudulent intent could be inferred, the complaint must provide some factual support for the allegations of fraud. The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party." (citations omitted)); *Wayne Inv., Inc. v. Gulf Oil Corp.,* 739 F.2d 11, 14 (1st Cir.1984)

(same); *Luce v. Edelstein,* 802 F.2d 49, 54 n. 1 (2d Cir.1986) ("To satisfy Rule 9(b) [with respect to matters peculiarly within the opposing party's knowledge], the allegations must be accompanied by a statement of the facts upon which the belief is founded."); *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989) ("[E]ven under a non-restrictive application of [Rule 9(b) ], pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based.").

Were the law otherwise, a complaint could evade too easily the "particularity" requirement in Rule 9(b)'s first sentence. Suppose, for example, that in 1991 a corporation projects substantial revenues in the upcoming year. Suppose the corporation's actual 1992 sales are 50% less than predicted. To permit a securities fraud complaint to state, without more, that the corporation's executives "knew" in 1991 about the likely decline in 1992 sales would sanction what Judge Friendly called "fraud by hindsight," *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978), a practice that courts have not allowed. To understand the type of "particularity" that this Circuit has required, we have examined *Romani.* In that case, this Circuit considered a complaint that charged that a company's rosy financial predictions made in mid–1986 were misleading. See 929 F.2d at 877–79. The complaint conceded that early 1986 had been profitable but, to show knowledge of falsity, it pointed (1) to the company's later, actual poor financial performance in 1987–1989, see *id.* at 877, and (2) to a company document that said the company had begun to experience cash flow problems in late 1986 or early 1987, only a few months *after* it had predicted a bright future. See *id.* at 878–79. This court found that these allegations were not specific enough to meet the Rule 9(b) threshold. See *id.* at 880.

The "hindsight" at issue in *Romani* involved inferring, from later poor performance, earlier knowledge that such later performance was likely. The "hindsight" at issue here involves inferring, from a

later lawsuit, earlier knowledge that such a lawsuit was likely. A general averment of such knowledge, without more, will not do. We must decide whether the specific facts alleged in the complaint before us are different enough from those at issue in *Romani* to warrant a different legal result.

■ *Specific Factual Allegations.* As appellant points out, her complaint does more than make a simple conclusory assertion of "knowledge" of falsity (or "misleading incompleteness"). It also alleges four specific facts that, appellant claims, offer adequate support for the proposition that the defendants, in 1989 or 1990, knew that an IBM Credit lawsuit (or the like) was probable.

First, the complaint points out that IBM Credit did, in fact, bring a lawsuit in early 1991, only a few months after Cambex filed a financial statement that omitted to mention this potential future liability. The bringing of the lawsuit tends to show its earlier likelihood. And, the existence of that likelihood helps support (in an evidentiary sense) an inference that defendants knew about that likelihood.

We can understand how sometimes a later lawsuit, say a lawsuit charging bribery by a top company official, might constitute fairly strong evidence of earlier knowledge, say that the top official knew (a few weeks or months before) of the liability-causing, underlying facts. But, sometimes the later lawsuit would not readily permit such an inference. All depends upon the lawsuit's subject matter and the underlying circumstances. In this case, the appellant's complaint is not specific. It describes IBM Credit's allegations in general terms; it does not set forth the IBM Credit lease language; nor does it offer any factual reason to believe that Cambex feared a lawsuit based on that language. To the contrary, the complaint makes clear that Cambex publicized its IBM memory "trade-in" practice with a candor that seems inconsistent with knowledge of illegality or fear of a lawsuit. *See S.E.C. v. Steadman,* 967 F.2d 636, 641–42 (D.C.Cir.1992). Once we look past the complaint's conclusory characterizations to the facts that it character-

izes, we cannot find, in those facts, a lawsuit based upon the kind of egregiously illegal practice the illegality of which Cambex officials, earlier, would have had to have known. *Cf. Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986) (case against, say, conspirator "may not rest on a bare inference that the defendant 'must have had' knowledge of the facts.").

Second, the complaint says that a Cambex officer sold stock in Cambex before IBM Credit filed its lawsuit. Insider trading in suspicious amounts or at suspicious times, of course, could help the appellant. *See In Re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). But the complaint does not tell us when the Cambex officer sold the stock. And, the complaint indicates that the insider sold his shares at an average price under $14, only about 75 cents higher than the $13¼ price at which Cambex stock sold *after* IBM Credit announced its suit. The stock sale allegation does not help the plaintiff.

Third, the complaint says that the defendants' "knowledge is shown by the fact that Cambex agreed with its customers to 'restore' IBM memory units at the end of the customer's lease term with IBM credit." This fact tends to show that Cambex believed it was supposed to return IBM memory boards in leased computers to IBM. But, it also shows that Cambex did so. It shows nothing about Cambex's knowledge of the likely legality or illegality of Cambex accepting IBM memory boards and re-leasing them during the period of the IBM computer's lease from IBM Credit. One can as easily argue that Cambex thought returning the boards to the IBM machine would satisfy IBM Credit, as argue the contrary.

Fourth, the complaint alleges that Cambex quickly settled the lawsuit for a large amount of money (more than $5 million). We agree that this allegation helps the appellant. She can reasonably argue that it helps to support a chain of inferences: 1) that the suit was valid, 2) that its underly-

ing assertion (that IBM Credit's leases gave IBM Credit the right to control Cambex's use of IBM memories) was true, 3) that Cambex must have known this earlier, and 4) that Cambex therefore must have known earlier that a lawsuit (or the equivalent) was probable. In our view, however, this single, factual keystone—the settled lawsuit—is not strong enough to bear the great overarching weight of factual inference the plaintiff wishes it to support.

Our conclusion, in part, reflects logic. The inferential links are weak. Does the quick settlement, for example, suggest pre-lawsuit knowledge and recalcitrance or post-lawsuit surprise? And, how does the fact of settlement circumvent the vagueness of pre-lawsuit circumstances we have discussed above?

Our conclusion, in part, reflects precedent. The complaint before us resembles too closely the complaints in *Romani* and other "fraud by hindsight" cases to permit a different result here. *See e.g., Romani*, 929 F.2d at 880; *Bryson v. Royal Business Group*, 763 F.2d 491, 494 n. 7 (1st Cir. 1985); *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1042 (6th Cir.1991); *Dileo*, 901 F.2d at 628 (citing *Denny*); *Berliner v. Lotus Dev. Corp.*, 783 F.Supp. 708, 710 (D.Mass.1992); *Urbach v. Sayles*, 779 F.Supp. 351, 358 (D.N.J.1991).

Finally, our conclusion, to a degree, reflects policy. Given the costs of lawsuits to the parties, the public problems associated with overcrowded court dockets, and the correlative public and private benefits of settlements, we fear a rule of law that would discourage settlements by permitting securities fraud plaintiffs to make their claims by pointing to later-settled lawsuits and nothing more.

For these reasons, we believe that Rule 9(b) forbids a plaintiff to assert a fraud claim simply by pointing to a later-settled lawsuit the factual relation of which to earlier fraud is as uncertain as that described in the complaint before us.

## III

### Other Arguments

We consider two additional arguments that appellant might make in response to our analysis. First, appellant's complaint, as she has written it, focuses less upon the IBM Credit lawsuit than our opinion implies. Rather, the complaint frequently refers to the defendants' knowledge, not of the lawsuit, but of certain critical facts underlying the lawsuit, such as the fact that IBM Credit, not Cambex, owned the IBM memories that Cambex took in trade. The problem with these allegations (and with any argument based on them) is that the complaint nowhere explains how these facts (facts about rights to control memories) are material, *except* insofar as they formed a basis for IBM Credit's legal claim, which claim, in turn, led to a significant Cambex financial loss. As far as the complaint is concerned, Cambex's financial statements could have misled through omission only insofar as they omitted to disclose the likelihood of that potential loss-causing lawsuit. And, for reasons stated in Part II, the complaint does not set forth sufficient specific facts to justify a belief that the defendants knew that the loss-causing lawsuit was likely.

Second, the complaint sets forth a host of Cambex statements, other than income statements and balance sheets, related to Cambex's IBM memory trade-in activity and its profitability. It says that Cambex, in making these (literally accurate) statements, materially misled investors by failing to qualify them by noting the likelihood that the activity would create considerable Cambex liability to IBM Credit. And, these statements may be subject to a different potential liability-disclosing standard than formal income statements or balance sheets. *See, e.g.*, 17 C.F.R. § 229.-303(a)(3)(ii) (requiring description of "known trends or uncertainties that have had or that registrant reasonably expects will have a material favorable or unfavorable impact...."); S.E.C.Rel. Nos 33–6835, 34–26831 (May 18, 1989) (under § 229.303, "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.")

We need not investigate the merits of this claim, however, nor need we decide whether the appropriate standard is knowledge (1) that an IBM Credit lawsuit was "probable" or (2) that the lawsuit (or some similar loss) was "reasonably likely". Whether the standard is one or the other or yet some third similar standard (such as "reasonably expects"), we should reach the same result. The complaint, for the reasons set forth in Part II, fails adequately to specify facts that would meet any of them. We cannot find specific factual allegations in the complaint that set forth a basis for the conclusion that Cambex or its officers knew of a significant possibility of loss flowing from the IBM Credit leases prior to the time IBM Credit filed its lawsuit.

For these reasons, the judgment of the district court is

*Affirmed.*