Richard I. BURSTEIN and David A. Bamel, on behalf of themselves and all others similarly situated,

v.

APPLIED EXTRUSION TECHNOLOGIES, INC., Amin J. Khoury, Robert C. Slocumb, Paul W. Marshall, Richard G. Hamermesh, Hansjoerg Wyss, B. Martha Cassidy, Fred C. Danforth, Joseph O'Donnell, Petros A. Palandjian, Mark Harmeling, Nader Golestaneh, Bruce A. Edge.

Civ. A. No. 92–12166–S.

United States District Court, D. Massachusetts.

Aug. 12, 1993.

Jeffrey S. Goddess, Rosenthal Monhait, Gross & Goddess, Wilmington, DE, Susan Schneider Thomas, Dennis J. Johnson, Zlotnick & Thomas, Bala Cynwyd, PA, for Richard I. Burstein.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, for David A. Bamel.

John D. Donovan, Jr., Robert Mirabella, Ropes & Gray, Boston, MA, Kevin G. Abrams, Richards, Layton & Finger, Wilmington, DE, for Applied Extrusion Technologies, Inc.

John D. Donovan, Jr., Robert Mirabella, Ropes & Gray, Boston, MA, Kevin G. Abrams, Richards, Layton & Finger, Wilmington, DE, for Amin J. Khoury, Robert C. Slocumb, Paul W. Marshall, Richard G. Hamermesh, Hansjoerg Wyss, B. Martha Cassidy, Fred C. Danforth, Joseph O'Donnell, Petros A. Palandjian, Mark Harmeling, Nader Goldstaneh and Bruce A. Edge.

Robert Y. Murray, Gordon P. Ramsey, Ramsey, Murray & Jenkins, Boston, MA, for PaineWebber, Inc.

## MEMORANDUM ON DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED AND CONSOLIDATED COMPLAINT (# 16)

COLLINGS, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiffs Richard I. Burstein ("Burstein") and David A. Bamel ("Bamel") have instituted the instant action on their own behalf and as representatives of a purported class against defendant Applied Extrusion Technologies, Inc. ("AET") and twelve individual defendants, each of whom was either a member of the Board of Directors of AET and/or served as a principal executive officer of that company during the relevant period.[1] In their six-count consolidated and amended class action complaint, Burstein and Bamel allege that the defendants have violated the following federal securities laws: §§ 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o (Count I); § 12(2) of the 1933 Act, 15 U.S.C. § 77l(2) (Count II); 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, 15 U.S.C. § 78j(b) (Count III); and § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (Count IV). Further it is alleged that the defendants are liable under state law for violation of Massachusetts General Laws Chapter 93A (Count V) and negligent misrepresentation (Count VI).

Pursuant to Rules 12(b)(6) and 9(b), Fed. R.Civ.P., the AET defendants have moved to dismiss the plaintiffs' amended and consolidated complaint in its entirety. The issues raised by the defendants' motion have been fully briefed, and oral argument was heard on June 30, 1993. With the record now complete, the defendants' disposition motion is in a posture for decision.[2]

## II. THE FACTS

It is axiomatic that in the context of a motion to dismiss, the focus is upon the sufficiency of the complaint. The facts as alleged are accepted as true, and all reasonable inferences arising therefrom are viewed in a light favorable to the plaintiffs. In support of their claims, Burstein and Bamel allege the following facts in their amended and consolidated complaint. (# 20)

Plaintiff Burstein is an individual who purchased two hundred (200) shares of the com-

---

1. The fourteenth named defendant, PaineWebber Incorporated, has been dismissed. *See* # 30.

2. The parties have consented, in accordance with Title 28 U.S.C. § 636(c), to the referral of this case to the undersigned for the purpose of ruling on the Defendants' Motion to Dismiss Plaintiffs' Amended and Consolidated Complaint (# 16) and entering a judgment of dismissal should the motion be allowed. *See* # 23.

mon stock of AET in an initial public offering of the company stock. (# 20, ¶ 5a) Plaintiff Bamel is an individual who purchased varying numbers of shares of the common stock of AET on four different dates: three thousand (3,000) shares on August 1, 1991; two thousand (2,000) shares on August 14, 1991; fifteen hundred (1,500) shares on September 19, 1991; and fifteen hundred (1,500) shares on November 20, 1991. (# 20, ¶ 5b) The prices Bamel paid for the AET common stock ranged from $9.50 per share to $11.50 per share. (*Id.*)

AET, a Delaware corporation with a principal place of business in Massachusetts, is a company engaged in the development, manufacture and sales of a wide range of thermoplastic products. (# 20, ¶¶ 3, 22) In December of 1990, AET paid eighteen million two hundred fifteen thousand dollars ($18,215,-000.00), including the assumption of six million five hundred thousand dollars ($6,500,-000.00) of debt, in order to acquire the Maynard Plastics Division of Chelsea Industries ("Maynard"). (# 20, ¶ 20) Maynard was described by AET as "one of the two principal manufacturers of monofilament, bioxially-oriented nets in the United States and one of the two domestic competitors for the Company's strong net products."[3] (# 20, ¶ 22) AET had no experience in manufacturing strong nets before acquiring Maynard. (*Id.*) Indeed, the Maynard acquisition was intended to complement AET's existing non-net thermoplastic product lines. (*Id.*)

In order to extinguish certain corporate debt, including that incurred in acquiring Maynard six months earlier, AET conducted an initial public offering of its common stock pursuant to a Registration Statement and Prospectus dated June 6, 1991. (# 20, ¶ 23) According to the Prospectus, AET's business strategy was

... to address rapidly growing niche markets and offer technologically advanced materials which improve the performance and competitive position of its customers' products. The Company has focused on developing an efficient, cost effective manufacturing process to enable it to supply these markets profitably.

*Id;* Memorandum in Support, # 19, Exh. A, Prospectus at p. 19 ("Prospectus").[4]

The primary elements of this strategy were the provision of technologically superior products, the penetration of diverse, growing niche markets and the development of highly efficient manufacturing processes. (# 20, ¶ 24; Prospectus at pp. 19–20) AET considered its success "in part to depend upon its ability to effectively [sic] manage the integration of Maynard Plastics." (# 20, ¶ 46; Prospectus at p. 6)

The plaintiffs allege that the Prospectus was materially false and misleading essentially in four respects. First, it was disclosed in the Prospectus that Amin J. Khoury, Chairman of the Board of Directors, President and Chief Executive Officer of AET, had received approximately one hundred thousand dollars ($100,000.00) "as compensation for services rendered in connection with the negotiation and closing of the [Maynard Plastic Acquisition] and the arrangements for its financing." (# 20, ¶ 25; Prospectus at p. 28) According to the plaintiffs, it was not disclosed that over one million dollars ($1,000,000.00) was paid, or to be paid, to K.A.D. Companies, Inc., a company wholly-owned by AET and Mr. Khoury, as fees for services rendered in connection with the Maynard acquisition and the initial public offering. (# 20, ¶¶ 25, 26) The defendants are alleged to have known, been reckless in not knowing or should have known that K.A.D. Companies, Inc. had provided such services. (# 20, ¶ 25) Further, the Prospectus additionally was purported to

---

3. Strong nets are "bioxially-oriented net products with high strength-to-weight ratios" that are used in different agricultural, environmental, home furnishing and packaging applications. (# 20, ¶ 21)

4. Although repeatedly referenced in the amended and consolidated complaint, a copy of the Prospectus was not appended thereto as an exhibit.

The defendants have attached a copy of the Prospectus to their Memorandum in Support of their motion to dismiss (# 19) as Exhibit A. This procedure is perfectly proper, as is the Court's consideration of this document in the context of a motion to dismiss. *See, e.g., Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1 Cir., 1991).

be materially false and misleading in failing to disclose that the fees paid to K.A.D. Companies, Inc. were excessive and gratuitous given Mr. Khoury's obligation as an officer and director of AET to assist in the acquisition and public offering. (# 20, ¶ 26)

Next, the plaintiffs contend that the sales figures and profits reported in the Prospectus were inflated and misleading because no reserve for returned products had been established. (# 20, ¶¶ 27, 28) The defendants are alleged to have known or recklessly disregarded the fact that product returns were a material element of AET's operation. (# 20, ¶ 27) Such returns were purportedly inevitable since AET's products were often manufactured to specification and AET was continuing to operate Maynard lines that historically had produced products with quality problems. (*Id.*)

As was disclosed in the Prospectus, Maynard had experienced losses during fiscal years 1989 and 1990. (# 20, ¶ 29; Prospectus at p. 16) It was AET's stated belief that these pre-acquisition losses "were attributable primarily to manufacturing inefficiencies in the operations of Maynard" under the former owners. (*Id.*) At the time of the public offering, AET had already inaugurated a program at Maynard to enhance productivity and promote more efficient material utilization thereby increasing profitability. (*Id.*) Consequently it was reported in the Prospectus that AET

> ... anticipates that lower gross margins for products manufactured at the Maynard Plastics facility will continue to have an effect on the Company's operating results until that program has been fully implemented, but believes that this effect will be of decreasing significance over the next twelve months.

# 20, ¶ 30; Prospectus at p. 16.

Also disclosed was the fact that, as part of the integration, AET intended to consolidate the Maynard production operation physically into its Salem, Massachusetts facility. (# 20, ¶ 40; Prospectus at p. 23)

The third respect in which the plaintiffs contend that the Prospectus was false or misleading is the suggestion that all the Maynard operation needed to be competitive and profitable was more effective, efficient management when, in reality, the defendants knew, should have known, or recklessly disregarded material facts or circumstances to the contrary. (# 20, ¶ 35) In this regard, the plaintiffs catalogue a variety of factors relating to the integration of Maynard that were purportedly either misstated in, or omitted from, the Prospectus. Inter alia, it is alleged that the Maynard operation had experienced ongoing quality problems with its products that could not be alleviated without major restoration and retooling of the production lines (# 20, ¶ 37); that the Maynard operation was incapable of producing competitive extruded netting products absent complete disassembly and overhaul of the machinery (# 20, ¶ 35); that the Maynard operation could not produce the square strong net products necessary to be competitive unless the production lines were revamped with new dies that could produce true square net (# 20, ¶ 36); that AET would either itself have to develop the requisite die technology or it would have to utilize proprietary technical information wrongfully appropriated from its primary competitor (# 20, ¶ 37); that the Maynard integration plan relied upon the technical expertise of persons hired by AET who were former employees of its competitor Leucadia, Inc., as well as the use of thousands of documents wrongfully appropriated from Leucadia, Inc. by those employees (# 20, ¶¶ 32, 33); that these former Leucadia, Inc. employees were bound by confidentiality agreements not to disclose the technology that AET needed (# 20, ¶ 33); that absent the ability to utilize the proprietary information and documents from Leucadia, Inc., AET would suffer substantial delay and expense in its effort to make the Maynard lines efficient and competitive. (# 20, ¶ 32)

At the time of the initial public offering, a lawsuit filed by Leucadia, Inc. on November 20, 1990 against AET was pending. (# 20, ¶ 31; Prospectus at p. 25) The existence of this litigation was disclosed in the Prospectus along with the following details:

> The Company (AET) and Leucadia are the only parties to the action, which seeks injunctive relief and damages based on allegations that the Company has engaged

in actual or threatened misappropriation of Leucadia's alleged trade secrets and confidential business information relating to extruded and/or oriented plastic netting products. The Company has answered and counter-claimed, seeking injunctive relief and damages against Leucadia, Inc. for attempted monopolization and abuse of process.

*Id.*

AET further stated that "[m]anagement does not believe that any of these legal proceedings will have a material adverse effect on the financial condition or results of operations of the Company." (# 20, ¶ 31; Prospectus at p. 25.) In the notes to its financial statements, AET again referenced the pending litigation, noting the company's intent "to vigorously [sic] defend this action. At present, the litigation is in the preliminary stages, and management and legal counsel are presently unable to predict the outcome." (Prospectus at p. F–12) AET then reiterated its belief that the lawsuit would not have a "material adverse effect" on its financial condition. (*Id.*)

The plaintiffs allege that the Prospectus was false and misleading in that it failed to disclose that the Leucadia litigation was likely to have a material adverse effect on the success of the Maynard integration if AET was prohibited from using Leucadia proprietary information and the expertise of its former employees which were necessary to make the Maynard operation effective and profitable. (# 20 ¶ 31) It is further alleged that the defendants knew or recklessly failed to know that their employees had wrongfully misappropriated thousands of proprietary or trade secret documents from Leucadia and, consequently, that the litigation would be resolved on terms onerous to AET. (# 20, ¶ 47)

The plaintiffs additionally raise claims on behalf of purchasers of AET stock in the open market subsequent to the initial public offering. The focus of these allegations is on four particular disclosures occurring during the class period.

First it is alleged that based upon the AET defendants' misleading description of their business operation and plans to improve gross profit margins, PaineWebber Incorporated, the underwriter in the Offering, issued a highly complimentary report on July 2, 1991. (# 20, ¶ 50) The plaintiffs assert that the defendants' statements to PaineWebber which were substantially similar to those set forth in the Prospectus were false and misleading for the reasons discussed earlier. (# 20, ¶ 53)

Two months after the initial offering, in or about August, 1991, AET agreed to settle the pending litigation with Leucadia, Inc. (# 20, ¶ 54) It is alleged that pursuant to the terms of the settlement agreement, AET and certain of its employees agreed

a) to return over ten thousand documents to Leucadia, including customer lists, research reports, technical drawings and related confidential information; b) to refrain from inducing former Leucadia employees to disclose any confidential or trade secret information of Leucadia; and c) to refrain for a three year period from using or developing independently *any* annual [sic] reciprocating piston or striker die process utilized by Conwed.

*Id.* (emphasis in original).

The plaintiffs assert that although this agreement constituted a major setback for the Maynard integration plan and the goal of improving Maynard's operating efficiencies, the defendants misleadingly represented to the public that the Leucadia litigation had been "dismissed, with prejudice." (*Id.*) Because the settlement papers were filed under seal, it is alleged the defendants could and did deliberately conceal the true terms of the agreement from AET stockholders and the investing public. (*Id.*)

Next the plaintiffs contend that the sales and earnings figures contained in AET's Third Quarter Report issued on or about August 15, 1991 were materially inflated because there were no provisions made for estimated product returns or defective inventory. (# 20, ¶ 56) For the same reason, a representation by defendant Khoury in a letter to shareholders accompanying the report that AET's gross and operating margins were "significantly better" is alleged to have been false and misleading. (# 20, ¶ 57)

Finally, in mid-November of 1991, the price of AET stock dropped suddenly. (# 20, ¶ 63) In response to inquiries about the decline, defendant Edge, the chief financial officer of AET, "informed analysts that there was no news from the Company that would cause the stock to be weak." (*Id.*) Further, analysts were advised that the year-end audit was completed ahead of schedule and had gone smoothly. (*Id.*) Based on this information, analysts repeated their "attractive" rating and urged investment in AET stock. (*Id.*)

On December 2, 1991, AET released its fourth quarter earnings which proved to be significantly less than those in the third quarter and about half of what analysts had estimated. (# 20, ¶ 64) During interviews following the fourth quarter report, AET disclosed that "it had produced large quantities of off-specification bioxially oriented strong nets", a product line acquired in the Maynard transaction, and that since at least October, customers had been returning significant quantities of these products. (# 20, ¶ 65) Moreover, substantial amounts of AET's inventory were also revealed to be off-specification. (*Id.*) As a consequence of these factors, AET reported virtually no gross profit in the fourth quarter for its strong net product line. (# 20, ¶ 66)

## III. THE MOTION TO DISMISS THE CLAIMS UNDER FEDERAL LAW

### A. *Failure to State a Claim*

 Characterizing the plaintiffs' claims as essentially alleging mismanagement of the Maynard integration by AET, the defendants argue that such purported corporate bungling cannot serve as a basis for liability under the federal securities law. Indeed, the law is quite clear, and the plaintiffs concur, that general corporate mismanagement claims are not actionable under the Securities Act of 1933 or the Securities Exchange Act of 1934. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977); *Vachon v. BayBanks, Inc.,* 780 F.Supp. 79, 80 (D.Mass., 1991); *Konstantinakos v. Federal Deposit Insurance Corporation,* 719 F.Supp. 35, 39 n. 7 (D.Mass., 1989); *Massaro v. Vernitron Cor-*

*poration,* 559 F.Supp. 1068, 1079 (D.Mass., 1983). From the plaintiffs' perspective, however, the defendants misconstrue their allegations. The plaintiffs contend that the claims are not premised upon poor business or management decisions by AET, but rather on the grounds that the defendants knew or recklessly disregarded specific serious problems existing in association with the Maynard integration, yet failed to disclose these material facts. The distinction is crucial: "... allegations constitute adequate claims under federal securities law [when] their essence lies in a failure of full and fair disclosure, not in a failure to manage the company well." *Slavin v. Morgan Stanley & Co., Inc.,* 791 F.Supp. 327, 333 (D.Mass., 1992) (citations omitted); *see also,* e.g., *In re Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 639 (3 Cir., 1990); *In re Meridian Securities Litigation,* 772 F.Supp. 223, 226–227 (E.D.Pa., 1991).

In support of their position, the defendants focus primarily upon the claims that both the Prospectus and Third Quarter Report falsely represented AET's financial condition by failing to provide a reserve for product returns. Relying on the decisions in *Vachon v. Bay-Banks, Inc., supra,* and *Akerman v. Bankworcester Corp.,* 751 F.Supp. 11 (D.Mass., 1990), it is argued that federal securities claims arising from corporate business decisions with respect to the timing or measure of reserves against future losses are untenable as a matter of law. A review of the facts of these two cases is in order.

Purchasers of shares of BayBanks, Inc. stock alleged in the *Vachon* case that the defendants had issued a number of public statements during the class period that were false and misleading in violation of § 10(b) of the 1934 Act and Rule 10b–5. Inter alia, BayBanks had stated that its loan loss reserves were adequate. The plaintiffs claimed in their amended complaint that the loan loss reserves in fact were "grossly inadequate" when considered in light of prevailing economic conditions in the New England real estate market as well as banking industry practice. It was alleged that the failure to disclose this gross inadequacy constituted a materially misleading omission.

In ruling on the defendants' motion to dismiss, the Court determined that the true nature of the plaintiffs' allegations related to purported inept corporate management and decisionmaking during an economic recession rather than fraud. The allegations were found to be much too general:

> Because the complaint contains no facts indicative of any problem specific to Bay-Banks which would permit charging it with fraud in maintaining its loan reserves, *see, Driscoll v. Landmark Bank for Sav.,* 758 F.Supp. 48, 53 (D.Mass.1991), the argument based on prevailing economic conditions must fail.

*Vachon v. BayBanks, Inc., supra,* 780 F.Supp. at 81 (footnote omitted).

In short, the Court concluded that there were no circumstances alleged from which fraud could be inferred.

The *Akerman* case presented a similar scenario: shareholders suing a bank for failing to disclose, among other things, the alleged gross inadequacy of its loan loss reserves. Granting the defendants' motion to dismiss, the Court noted that the plaintiffs' allegations all were "... conclusory statements that pertain more to mismanagement than to misrepresentation ... the plaintiffs here have failed to point to any concrete misrepresentation or material failure to disclose." *Akerman v. Bankworcester Corporation, supra,* 751 F.Supp. at 12–13. Other comparable decisions include *DiLeo v. Ernst & Young,* 901 F.2d 624, 625–627 (7 Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Wilkes v. Heritage Bancorp, Inc.,* 767 F.Supp. 1166, 1170–71 (D.Mass., 1991); *Driscoll v. Landmark Bank for Savings,* 758 F.Supp. 48, 52–53 (D.Mass., 1991); *Loan v. Federal Deposit Insurance Corporation,* 717 F.Supp. 964, 967 (D.Mass., 1989).

■ Contrary to the defendants' interpretation of these cases, the Court does not cull a general principle of law from them that allegations with respect to the inadequacy of loan loss reserves "are not susceptible to challenge under the securities acts." Memorandum in Support, # 19 at p. 17. For example, although the complaint was dismissed in the *Driscoll* case, the court granted leave to amend in order to plead fraud with particularity. *Driscoll v. Landmark Bank for Savings, supra,* 758 F.Supp. at 54. In the case of *In Re Meridian Securities Litigation,* allegations regarding specific public statements purportedly understating loan loss reserves were deemed sufficient to withstand a motion to dismiss. *In Re Meridian Securities Litigation, supra,* 772 F.Supp. at 226–227; *see also, e.g., In Re Midatlantic Corporation Shareholder Litigation,* 758 F.Supp. 226, 232–233 (D.N.J., 1990). Thus, allegations relating to the inadequacy of loan loss reserves potentially are actionable under the securities laws. The key seems to be whether the "problems [of product returns] were so apparent that reserves should have been jacked up" at the time of the Prospectus and Third Quarter Report so that "... failure to increase the reserves amounted to 'fraud'." *DiLeo v. Ernst & Young, supra,* 901 F.2d at 627 quoted in *Vachon v. BayBanks, Inc., supra,* 780 F.Supp. at 81. Whether they are so depends upon the nature and sufficiency of the facts as alleged.

■ In the present case, the plaintiffs allege that prior to the Maynard acquisition, AET had no experience in producing strong nets. (# 20, ¶ 22) At the time that the Prospectus and Third Quarter Report issued, the Maynard integration process was underway. (# 20, ¶ 29) Products manufactured on Maynard's production lines had suffered ongoing quality problems, yet AET continued to operate those lines at increased capacities thereby virtually ensuring quality control problems. (# 20, ¶¶ 37, 39, 42) According to the plaintiffs,

> The undisclosed risks inherent in operating those plants above normal capacities were particularly substantial due to defendants' general unfamiliarity with the plants, which had just been acquired in December 1990, and defendants' lack of involvement in the strong net market prior to the acquisition.

# 20, ¶ 43.

Based on these facts, the plaintiffs assert it can be inferred that the defendants knowingly or recklessly misstated AET's financial

condition by failing to reserve for likely product returns.

While the plaintiffs have alleged more specific circumstances underlying their claim than were present in either the *Vachon* or *Akerman* cases, the thrust of the allegations nevertheless is that AET, due to inexperience, exercised poor business judgment. Mismanagement, not fraud, lies at the heart of the claims based on failure to maintain a sufficient reserve for product returns. As such, the plaintiffs' claims that the Prospectus and Third Quarter Report were materially false and misleading because no reserve for returned products was established must fail.

■ These specific claims aside, the defendants argue that the remainder of the primary allegations similarly bespeak of mismanagement of the Maynard integration process. The Court does not concur.

As noted hereinabove in the factual recitation, the plaintiffs have detailed a litany of material facts and circumstances regarding the integration of Maynard that allegedly were either misstated in, or omitted from, the Prospectus. (# 20, ¶¶ 32–37) Paraphrasing the allegations, the plaintiffs contend that the Maynard lines could not produce true square net products which were essential for the company to be competitive without new dies. AET was relying upon the technical expertise of former employees of its main competitor, as well as proprietary information wrongfully appropriated from the competitor, in order to make the integration successful. AET's acquisition and utilization of this proprietary information was being challenged in a pending lawsuit. Absent access to this ill-gotten expertise and technical information, AET would have to develop the requisite die technology independently, which would cause significant delay and added expense in the integration process.

The substance of these allegations is not that AET bungled the Maynard integration. Rather, they set forth material facts and circumstances existing at the time of the initial public offering of which the defendants allegedly were aware, but did not disclose. The essence of these allegations is fraud, not mismanagement.

■ The defendants' argument that AET was not obligated to predict and disclose the financial consequences of its purported mismanagement is equally unavailing. As a general legal principle, it may well be true that the securities laws do not demand such prognostication. *See,* e.g., *Pavlidis v. New England Patriots Football Club, Inc.,* 737 F.2d 1227, 1233 (1 Cir., 1984) ("The federal securities laws do not require corporate management to include speculations about future profitability in proxy statements.") By the same token, it is quite clear that "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26 (1 Cir., 1987).

As noted earlier, it was stated in the Prospectus that AET

> ... anticipates that lower gross margins for products manufactured at the Maynard Plastics facility will continue to have an effect on the Company's operating results until that program has been fully implemented, but believes that this effect will be of decreasing significance over the next twelve months.

# 20, ¶ 30; Prospectus at p. 16.

The plaintiffs' allegations with respect to the known need to completely overhaul and revamp the Maynard production lines, the requirement for new die technology to produce competitive, true strong net products, the reliance upon Leucadia technology and expertise, the increased cost and delay inherent in developing the die technology if Leucadia proprietary information were deemed inaccessible, etc., implicate the accuracy and reasonableness of AET's stated belief. Moreover, the focus of the majority of the plaintiffs' allegations is on significant facts that the defendants knew or recklessly disregarded at the time the Prospectus issued, but omitted or misstated therein, not on future events.

■ Finally, the defendants contend that the Prospectus adequately advised of the risks involved in investing in AET, clearly "bespeaking caution." *Romani v. Shearson*

*Lehman Hutton,* 929 F.2d 875, 879 (1 Cir., 1991). A claim of nondisclosure will not lie when a prospectus meaningfully, fully and fairly warns of the risks associated with the investment. *Id.; see also, Lucia v. Prospect Street High Income Portfolio,* 769 F.Supp. 410, 413 (D.Mass., 1991); *Miller v. New America High Income Fund,* 755 F.Supp. 1099, 1103 (D.Mass., 1991).

 To be sure, there is cautionary language in the Prospectus. For example, potential investors are advised that financial data from prior quarters "are not necessarily indicative of future performance." (Prospectus at p. 10.) Further, investors were warned that lower gross profit margins for products manufactured on the Maynard lines were anticipated to effect AET's operating results, but as the efficiency program became fully implemented, the effect should decrease over the following year. (Prospectus at p. 16.)

The recent Maynard acquisition was disclosed in the 'Risk Factors' section, along with the statement "[t]he success of the Company will in part depend upon its ability to effectively [sic] manage the integration of Maynard Plastics." (Prospectus at p. 6.) Taking the plaintiffs' allegations as true, however, what was not disclosed were specific circumstances and problems that existed, significantly hampering AET's "ability to effectively manage the integration." While the possibility of an unsuccessful integration may have been apparent, absent more complete information, investors would be unable to judge the likelihood of success in a meaningful way. In short, it cannot be said as a matter of law that the Prospectus was so suffused with cautionary language, and so clearly and adequately disclosed the risks involved in investing, that the plaintiffs' claims must fail as a matter of law.

To summarize, the defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), shall be allowed with respect to the claims that the Prospectus and the Third Quarter Report misrepresented AET's financial condition by failing to

establish a reserve for returned products. In all other respects, the motion shall be denied.

### B. Failure to Plead Fraud With Particularity [5]

 The defendants contend that the allegations of the consolidated and amended complaint fail to comply with Fed.R.Civ.P. 9(b) which requires that

In averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of the mind of a person may be averred generally.

Rule 9(b), Fed.R.Civ.P.

There can be no doubt that in this Circuit, Rule 9(b) is applied to securities fraud claims with rigor. *Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878; *Royal Business Group Inc. v. Realist, Inc.,* 933 F.2d 1056, 1065–1066 (1 Cir., 1991). Indeed, the First Circuit has stated:

It is well settled that Rule 9(b) requires the plaintiff in a securities fraud case to specify the time, place and content of an alleged false representation ... The requirement that supporting facts be pleaded applies even when the fraud relates to matters peculiarly within the knowledge of the opposing party.

*Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878 (citations omitted).

A general averment of knowledge of falsity will not suffice; the complaint must *"also* set( ) forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corporation,* 975 F.2d 22, 25 (1 Cir., 1992) (Emphasis in original) (citations omitted).

### 1. The Prospectus

#### a. The Integration Claim

 The plaintiffs allege that AET knew or recklessly disregarded adverse facts and

---

5. The Court need not decide whether Fed. R.Civ.P. 9(b) applies to the section 12(2) securities act claims.

circumstances relating to the Maynard integration at the time of the initial public offering, but did not disclose them in the Prospectus. As factual support, it is alleged that Maynard had a history of continuing quality problems with its products and was incapable of producing competitive "high quality bioxially oriented monofilament extruded netting products." (# 20, ¶¶ 34, 37) In order to alleviate these problems, the Maynard lines needed to be completely overhauled and revamped with new dies that could produce true strong net as opposed to diamond net, an inferior product. (# 20, ¶¶ 34, 35, 36) AET's plan to improve the Maynard production lines was dependent upon utilization of technical research, development and manufacturing expertise of former employees of its primary competitor who were bound by confidentiality agreements not to disclose the technology that AET needed. (# 20, ¶¶ 31, 33) Further, AET contemplated using thousands of documents containing proprietary information of Leucadia to upgrade the Maynard lines so as to make them operate efficiently and competitively. (# 20, ¶¶ 32, 33) The technology and proprietary information that AET needed was at the heart of the ongoing trade secrets lawsuit filed against AET by Leucadia. (# 20, ¶ 33) Without access to the Leucadia documents and former personnel, AET would face both significant delay and expense in making the Maynard production lines competitive because the requisite die technology would have to be independently developed. (# 20, ¶ 36)

AET had acquired Maynard six months prior to the initial public offering. It can reasonably be inferred that AET had assessed and evaluated what steps were necessary to make Maynard competitive and profitable. Indeed, the integration process was underway at the time the Prospectus was issued. Moreover, it can also be reasonably inferred that AET knew that it had hired former employees of its major competitor who were alleged to have wrongfully misappropriated thousands of documents containing proprietary technical information. The Leucadia litigation was instituted in November of 1990, approximately seven months before the offering.

There is no apparent dispute that the time, place and content requirements of Rule 9(b) are met with respect to all of the plaintiffs' claims. Moreover, with respect to the integration claim, the additional prerequisite of the rule is satisfied. These factual allegations are neither vague nor conclusory. Rather, they

> ... would support a reasonable inference that adverse circumstances existed at the time (the statement or representation was made), and were known and deliberately disregarded by the defendants.

*Romani v. Shearson Lehman Hutton, supra,* 929 F.2d at 878. In short, this claim complies with the particularity requirements of Rule 9(b).

#### b. The Litigation

■ In the Prospectus, AET stated that "[m]anagement does not believe that any of these legal proceedings [the Leucadia litigation] will have a material adverse effect on the financial condition or results of operations of the Company." (Prospectus at p. 25.) The plaintiffs essentially claim that this statement was false or misleading in that the defendants knew or recklessly disregarded that the Leucadia litigation was in fact likely to have a material adverse effect on AET's integration plan for Maynard.

The factual allegations in support of this claim are as stated above. Again, the complaint details the inability of the Maynard production lines to produce true strong net products, a factor that substantially caused Maynard's unprofitable status. (# 20, ¶ 36) In order to become competitive, the Maynard operation had to be overhauled and updated, not merely made more efficient. (# 20, ¶ 35) It is specifically alleged that

> As defendants knew or were reckless in not knowing, AET was incapable of revamping the Maynard production lines with new dies that could produce true square net unless it utilized proprietary technical documents being made available to it by its newly-hired employees, who had wrongfully appropriated those documents from Leucadia, or unless and until AET was able to develop independently

the die technology needed to make competitive square net products. # 20, ¶ 36.

The Leucadia trade secrets action against AET had been ongoing for seven months at the time of the initial public offering, and it is alleged that the defendants had reason to know that the documents would have to be returned to Leucadia, that Leucadia had substantial grounds for seeking preliminary injunctive relief, and that these circumstances would cause expense and delay in the integration plan. (# 20, ¶¶ 32, 33)

It is further alleged that the Leucadia litigation was settled in August of 1991, two months after the offering. (# 20, ¶ 54) The settlement terms included agreements by AET to return thousands of documents to Leucadia, to refrain from inducing former Leucadia employees from divulging proprietary or trade secret information and to refrain from using or developing any annular reciprocating piston or striker die process for a period of three years. (*Id.*)

In challenging this claim, the defendants first take the position that as a matter of law they were under no duty to disclose corporate misconduct associated with the Leucadia litigation in the Prospectus. The case of *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22 (1 Cir., 1987) is cited in support of this legal proposition. In *Roeder,* an investor alleged that the company in which he owned stock failed to disclose timely certain criminal activity by an officer of the corporation. Although the company knew of the bribery and the ongoing criminal investigation, the information was not announced until indictments appeared imminent. Affirming the district court's dismissal of the complaint, the First Circuit confirmed that a corporation is under no affirmative duty "to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete or misleading prior disclosures." *Roeder v. Alpha Industries, Inc., supra,* 814 F.2d at 27.

The defendants argue that, because they complied with SEC reporting regulations in the Prospectus and there is no insider trading alleged, they had no further disclosure obligation. However, AET did more than describe the pending Leucadia litigation in the Prospectus. A further, affirmative statement was made that management did not believe the lawsuit would have a material, adverse effect on the operation of the company. The plaintiffs specifically allege that this statement was false and misleading. This fact distinguishes the present complaint from that in the *Roeder* case where no inaccurate or misleading voluntary disclosure was identified. *Roeder v. Alpha Industries, Inc., supra,* 814 F.2d at 26.

The *Roeder* court noted that

> When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate ... 'If ... a company chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth.'

*Roeder v. Alpha Industries, Inc., supra,* 814 F.2d at 26. (citations omitted).

The plaintiffs have alleged sufficient facts to support a reasonable inference that the Leucadia lawsuit would have a material impact upon the Maynard integration. Having voluntarily chosen to make a positive statement with respect to the litigation, the defendants had a duty to make that disclosure "accurate and complete."

The defendants next argue that the decision in *Greenstone v. Cambex Corporation,* 975 F.2d 22 (1 Cir., 1992) is on all fours and thus clearly dispositive of the plaintiffs' claim. In *Greenstone,* an investor instituted a securities fraud claim against Cambex Corporation alleging that "... Cambex's financial statements, though literally true, were 'misleading' in 'light of the circumstances under which they were made,' for they failed to disclose Cambex's potential liability to IBM lessors." *Id.* at 24. The Court determined that the complaint alleged "fraud by hindsight" and affirmed the dismissal of the action.

The facts in *Greenstone* can readily be distinguished in key respects from those alleged in the present complaint. At the outset, the lawsuit in the *Greenstone* case was filed after the allegedly misleading financial statements were released. The First Circuit

pointed out that "[t]he bringing of the lawsuit tends to show its earlier likelihood. And, the existence of that likelihood helps support (in an evidentiary sense) an inference that defendants knew about that likelihood." *Greenstone v. Cambex Corporation, supra,* 975 F.2d at 26. Not only is it alleged in the instant complaint that the Leucadia lawsuit had been pending for seven months at the time of the initial offering, the subject matter and circumstances of Leucadia's claims are detailed. Leucadia's lawsuit is described as a trade secrets action seeking injunctive relief. It is alleged that AET had hired former employees of Leucadia and that the defendants knew or recklessly failed to know that those employees had wrongfully appropriated thousands of proprietary or trade secret documents from Leucadia. It was further alleged that AET was relying on the Leucadia proprietary information and the technical expertise of the former Leucadia employees in order to succeed in the Maynard integration. On these facts, it is reasonable to infer, as alleged, that it was "virtually impossible for AET to avoid the Leucadia litigation being resolved on terms onerous to AET." (# 20, ¶ 47). Accepting the plaintiffs' allegations as true, AET's potential liability was clear.

As in the *Greenstone* case, the plaintiffs herein allege that the Leucadia litigation was settled shortly, i.e., within two months, after the Prospectus issued. Moreover, the terms of the settlement, as alleged, were not favorable to AET. The First Circuit was of the view that such allegations help the plaintiffs, stating that the investor

> ... can reasonably argue that it helps to support a chain of inferences: 1) that the suit was valid, 2) that its underlying assertion ... was true, 3) that [the defendant] must have known this earlier, and 4) that [the defendant] therefore must have known earlier that a lawsuit (or the equivalent) was probable.

*Greenstone v. Cambex Corporation, supra,* 975 F.2d at 26–27.

True, the Court determined that "this single, factual cornerstone," was not enough to carry the day in *Greenstone. Id.* at 27. However, added to the additional facts and circumstances alleged in the complaint at hand, the plaintiffs' litigation claim passes the Rule 9(b) hurdle.

### c. The Payment to K.A.D. Companies, Inc.

█ With respect to this claim, i.e., that AET paid K.A.D. Companies, Inc. approximately $850,000.00 that was not disclosed in the Prospectus, the defendants assert that the complaint fails to allege facts to create a reasonable inference that they knew at the time of the public offering that such a payment would be made.

It is alleged in the complaint that defendant Khoury is the Chairman of the Board, President and Chief Executive Officer of AET. (# 20, ¶ 7(a)) According to the Prospectus, Mr. Khoury was paid $100,000.00 "as compensation for services rendered in connection with the negotiation and closing of [Maynard Plastics Acquisition] and the arrangements for its financing." (Prospectus at p. 28; # 20, ¶ 25) It is alleged that a company wholly-owned by defendant Khoury, K.A.D. Companies, Inc., was paid over one million dollars by AET "in fees in connection with the acquisition of Maynard and the IPO itself." (# 20, ¶ 25)

On these facts, it is eminently reasonable to infer that, at the time of the offering, the defendants knew that the payment to K.A.D. Companies, Inc. was to be made or contemplated. Temporally, the acquisition, and presumptively the services rendered in connection therewith, took place six months prior to the initial public offering. Mr. Khoury individually had already been paid for his work in connection with the Maynard. acquisition. Surely defendant Khoury and AET knew of any additional services K.A.D. Companies, Inc. had performed.

Further, the work on the initial public offering essentially culminated in the Prospectus. Presumably most, if not all, of K.A.D. Companies, Inc.'s services in connection with the initial public offering had been rendered by June 6, 1991, the Prospectus date. In short, it stretches credulity to contend that an inference of knowledge on behalf of the defendants of the anticipated payment is unwarranted. The defendants' chal-

lenge to the sufficiency of the K.A.D. Companies, Inc. payment claim must fail.

### 2. Post–Offering Statements

In their opposition to the motion to dismiss, the plaintiffs characterize their claims with respect to the July 2, 1991 PaineWebber Report and the August 12, 1991 Paine-Webber Report as well as the Khoury letter as "product return" claims, i.e., claims that the defendants did not set up adequate reserves for anticipated product returns. (*See,* # 29 at pp. 24; 48–49) Because these claims are being dismissed pursuant to Rule 12(b)(6), their sufficiency need not be tested under Rule 9(b).

#### a. The Leucadia Settlement

On October 14, 1991, the defendants issued a press release stating that "AET was granted an order dismissing all claims in the Leucadia litigation." (# 20, ¶ 62) Further, it is alleged that AET stated "it was 'now free to aggressively [sic] pursue strategic goals in its netting business with its full complement of technical and marketing specialists'." (*Id.*) The plaintiffs also assert that Leucadia's counsel found the press release to be so misleading that he sent AET's counsel a letter of protest. (# 20, ¶ 62 and Exh. A)

It is alleged that AET's press release was materially false and misleading in that the full terms of the settlement agreement and their impact on AET's Maynard integration plan were not disclosed. (# 20, ¶ 62) The defendants argue that the plaintiffs have failed to allege sufficient facts to support an inference that AET's statements were knowingly or recklessly false when made.

The allegations with respect to the Leucadia lawsuit have been recounted at length, and need not be revisited. Specific factual support from which reasonable inferences of knowledge can be made has been alleged. Just by way of example, to state that AET can pursue its strategic goals in its netting business with its full complement of technical specialists is misleading if, as alleged, AET depended upon the technical expertise and proprietary information gained from former Leucadia employees, who, according to the alleged settlement terms, must return the documents to Leucadia and refrain from divulging Leucadia's trade secrets. In short, the plaintiffs' claim passes muster under Rule 9(b).

#### b. Defendant Edge's Statement

It is alleged that in response to analysts' questions with respect to a marked decrease in AET's stock prices on November 18–19, 1991, defendant Edge, AET's Senior Vice President, Chief Financial Officer, Treasurer and Secretary, stated "that there was no news from the Company that would cause the stock to be weak." (# 20, ¶¶ 7(e), 63) This statement is alleged to be false and misleading.

First, the defendants argue that the complaint fails to particularize any facts to support an inference that AET had knowledge of adverse circumstances at the time Edge's statement was made to render the statement false. However, at a minimum, the defendants knew of the terms of the Leucadia settlement which had been announced the prior month. Accepting as true the plaintiffs' allegations regarding the impact of that settlement on the Maynard integration plan, it is reasonable to infer that the defendants had knowledge that would effect AET's stock value.

The defendants next contend that the analysts to whom the statements were made are not identified. Attached to the complaint as Exhibit B is a letter from plaintiff Bamel to AET wherein Mr. Bamel states, inter alia:

> On Wednesday afternoon, November 20, 1991, your CFO spoke with Kim Retrievi, an analyst at Paine Webber, to discuss the possible cause for the recent weakness in the stock's price. In that discussion, the CFO informed Ms. Retrievi that "there is no news from the company that would cause the stock to be weak." ...
>
> Based on that conversation, Paine Webber reiterated its attractive rating and, in fact, suggested that the recent weakness could be viewed as an opportunity to accumulate additional shares.

# 20, Exh. B.

This exhibit reflects the plaintiffs' clear ability to remedy the deficiencies raised by the defendants, both with respect to specification and standing.

 Finally, the defendants argue that they were under no duty to make a disclosure and that the "no news" statement, like a "no comment" statement, is the "functional equivalent of silence." *Basic v. Levinson*, 485 U.S. 224, 239 at n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1985). The Court does not agree that the meaning imparted by these two statements are comparable. The statement "no comment" is neutral; "no news" is of a more affirmative nature. In other words, "no news" implies that there is in fact nothing to tell.

In this case, defendant Edge in essence denied that AET had knowledge of any negative facts or circumstances regarding the company that might cause a downward turn in stock prices. As noted hereinabove, if the defendants volunteer information, as defendant Edge did, it was incumbent upon them to ensure that the disclosure was accurate and complete.

## IV. THE MOTION TO DISMISS THE CLAIMS UNDER STATE LAW

### A. *The Misrepresentation Claim*

 Count IV is a state law claim for negligent misrepresentation. Under Massachusetts law "the tort of negligent misrepresentation requires privity between the parties. Absent privity, plaintiff must prove that the 'defendant had actual knowledge of plaintiff's reliance.'" *Hurley v. Federal Deposit Insurance Corporation*, 719 F.Supp. 27, 34 (D.Mass., 1989) (citations omitted); *Accord, Berliner & Lotus Development Corp.*, 783 F.Supp. 708, 713 (D.Mass., 1992); *In re Bank of Boston Corp. Securities Litigation*, 762 F.Supp. 1525, 1536 (D.Mass., 1991). Open-market purchasers of stock cannot meet this test and, consequently, their claims must be dismissed. *Berliner v. Lotus Development Corp., supra*, 783 F.Supp. at 713; *In re Bank of Boston Corp., supra*, 762 F.Supp. at 1536–1537. Moreover, even if purchasers in the initial offering may have an actionable claim, the complaint is completely devoid of any allegations either of privity between the plaintiffs and defendants or actual knowledge by the defendants of the plaintiffs' reliance. As such, the claims of purchasers in the initial offering too must fail. However, leave

shall be granted to amend. *See, In re Bank of Boston Corp., supra*, 762 F.Supp. at 1537 (summary judgment denied on negligent misrepresentation claim of class members who had purchased stock pursuant to a prospectus; such class members required to prove "direct reliance and defendant's knowledge thereof".).

### B. *The Chapter 93A Claim*

In Count V the plaintiffs allege that the defendants' actions constituted violations of Massachusetts General Laws Chapter 93A. A decision on the defendants' motion to dismiss this claim shall be pretermitted at present. The demand letter drafted by plaintiff Bamel is sufficient for him personally to proceed with the claim. Whether that letter is adequate on behalf of the class can await the determination of whether a class is to be certified. The Chapter 93A claim is based upon the same factors as are the securities claims. Thus, the scope of discovery will not be affected by reserving decision on this claim.

## V. CONCLUSION

 The defendants' motion to dismiss, to the extent that it seeks dismissal for failure to state a claim, with respect to the claims alleging failure to maintain an adequate reserve for "returned products" will be allowed and otherwise denied. To the extent that the motion to dismiss seeks dismissal for failure to plead fraud with particularity, the motion will be allowed with respect to the claim based on defendant Edge's statement and otherwise denied. The motion to dismiss the negligent misrepresentation claim will be allowed and action on the motion to dismiss the Chapter 93A claim will be pretermitted. Plaintiffs will be granted leave to file a second amended and consolidated complaint in order to amend *only* the claim based on defendant Edge's statement and the negligent misrepresentation claim on behalf of purchasers in the initial public offering in accordance with this memorandum. The second amended and consolidated complaint

shall be filed and served *on or before the close of business Friday, August 27, 1993.*