**In re GLENFED, INC. SECURITIES LITIGATION.**

John Paul DECKER, Arnold Cohen, Gary Haskins, Larry Schwartz, Gary F. Young, Elbridge Ruhl Graef, Trustee u/w of Charlotte R. Graef on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

GLENFED, INC., Norman M. Coulson, Raymond D. Edwards, Dann V. Angeloff, Dean R. Bailey, Charles T. Blair, Douglas A. Clarke, Morris K. Daley, Richard O. Kearns, Walter A. Ketcham, Jean C. Roeschlaub, Jack D. Steele, Gilbert R. Vasquez, E. Gex Williams, Jr., Keith P. Russell, Jr., Defendants–Appellees.

No. 92–55419.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted August 3, 1993.

Memorandum Sept. 15, 1993.

Order and Opinion Nov. 15, 1993.

Amended Opinion Dec. 22, 1993.

Order Granting Rehearing En Banc
Feb. 25, 1994.

Argued and Submitted April 21, 1994.

Decided Dec. 9, 1994.

Arthur R. Miller, Cambridge, MA, for plaintiffs-appellants.

Martin Carl Washton, Gibson, Dunn & Crutcher, Los Angeles, CA, for defendants-appellees.

Edward M. Gergosian, Barrack, Rodos & Bacine, San Diego, CA, for amicus.

Thomas J. Greco, American Bankers Ass'n, Washington, DC, for amicus.

Appeal from the United States District Court for the Central District of California.

Before: WALLACE, Chief Judge, SCHROEDER, FLETCHER, PREGERSON, CANBY, NORRIS, BEEZER, HALL, WIGGINS, RYMER and G. NELSON, Circuit Judges.

Opinion by Judge FLETCHER; Concurring only in result of Part IA of opinion, Judges NORRIS, BEEZER, HALL and RYMER; Separate Concurring opinion by Judge NORRIS, joined by Judges BEEZER, HALL and RYMER as to Parts I and III.

FLETCHER, Circuit Judge:

A three-judge panel affirmed the district court's dismissal of plaintiffs' securities fraud class action against GlenFed, Inc. and various of its officers and directors. *In re Glen-Fed, Inc. Sec. Litig.*, 11 F.3d 843 (9th Cir. 1993). The panel dismissed plaintiffs' claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as not meeting the requirements of Fed.R.Civ.P. 9(b).[1] The panel reasoned that "[a]lthough Rule 9(b) allows scienter to be pleaded generally, courts have required that the facts pled provide a basis for a strong inference of fraudulent intent." 11 F.3d at 848. As authority for this proposition, the panel cited two Second Circuit cases, *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991), and *Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). We granted plaintiffs' petition for rehearing en banc in order to determine whether the panel's requirement of a "strong inference of fraudulent intent" is consistent with Fed.R.Civ.P. 9(b), whether the panel's decision is consistent with circuit precedent, and whether we should embrace the Second Circuit's or any other circuit's approach. We vacate and remand to the panel.

## FACTS

We adopt and quote verbatim the statement of the case set forth by the panel at 11 F.3d at 845–47:

GlenFed, Inc. is a real estate and financial services holding company that declared a $140.8 million loss for the second quarter of fiscal year ("FY") 1991, after several years of reporting profitable operations. John Decker and other investors (the proposed class, or the "Plaintiffs") appeal the district court's dismissal of their second amended complaint against GlenFed, Inc. and its officers and directors under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), Rule

10b–5, 17 C.F.R. § 240.10b–5, promulgated by the Securities and Exchange Commission (SEC), and §§ 11, 12 and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77*l* and 77*o*, and various California state law theories including fraud, deceit and negligent misrepresentation.

Plaintiffs allege that GlenFed's officers and directors made misrepresentations and omissions designed to conceal GlenFed's deteriorating financial condition, lack of adequate internal controls and declining market. Plaintiffs contend that the district court erred in dismissing their complaint for failing to plead fraud with particularity, Fed. R.Civ.P. 9(b)....

Plaintiffs claim that GlenFed concealed deficiencies concerning its asset monitoring and loan underwriting policies that affected the quality of assets. They also claim that Glen-Fed understated loan loss reserves and failed to disclose the true facts regarding the disposition of subsidiaries, instead attempting to gain more favorable accounting treatment than the true facts would have warranted.

### A. Asset Quality and Strict Credit Procedures

GlenFed's annual reports referred to its "superior" or "excellent" asset quality and "stringent," "strict" and "rigorous" underwriting and credit procedures. Plaintiffs refer to a $20 million reduction in non-performing assets in the fourth quarter of 1990, supposedly attributable to rigorous loan approval and asset review procedures. According to Plaintiffs, it was apparent to the Defendants at least until June 1990 that loan underwriting and monitoring policies were inadequate and were not being followed. They contend that non-public information was available to the Defendants (reports from the internal audit department, an accounting firm providing management advisory services, government regulators and an investment banking firm) revealing that GlenFed's procedures were inadequate to de-

---

1. The district court dismissed the complaint pursuant to both Rule 9(b) and Rule 12(b)(6). The court's remarks at argument revealed that the plaintiffs' claims of primary liability under the federal securities laws were dismissed as not complying with Rule 9(b), and plaintiffs' secondary liability and state-law claims were dismissed as not complying with either Rule 9(b) or Rule 12(b)(6).

tect non-performing assets and set loan loss reserves. Plaintiffs allege the following facts: inaccurate (delayed) reporting of in-substance foreclosures (where collateral's fair value is less than the carrying value of the loan); inadequate monitoring of a loan to one borrower; failure to timely refer loans to foreclosure; concentration on loans 91+ days delinquent, rather than also attending to loans 31–60 and 60–90 days delinquent; and failing to update appraisals.

## B. Loan Loss Reserves

GlenFed embarked on a restructuring program with the stated purpose of improving core earnings and increasing capital as would be required by the Financial Institutions Reform, Recovery and Enforcement Act (FIR-REA). Form 10–Q filed with the SEC for the second quarter of FY 1990 characterized a $35 million increase in loan loss reserves as primarily due to a $30 million special charge to increase loan loss reserves to a more conservative level. In December 1990 (the second quarter of FY 1991), however, Glen-Fed announced that loan loss reserves were inadequate and had to be increased by $150 million, resulting in a $141 million loss and elimination of dividend payments. According to Plaintiffs, the cause of the huge increase in loan loss reserves was the result of finally disclosing what the Defendants knew all along, despite prior statements to the contrary: (1) loan loss reserves were inadequate, and (2) despite assurances of stability, many of the problem assets were in the California and Florida real estate markets. Plaintiffs ... [allege that] (1) financial analysts expected GlenFed to have operating income, rather than the loss attributable to the increased loan loss reserves, (2) the Florida economy had been in decline for many years and this was known to Defendants, (3) other thrifts reported increases in non-performing assets as of June 30, 1990, whereas GlenFed did not, and (4) other thrifts took losses on real estate loans and operations at least a year earlier than GlenFed. *See* Complaint ¶ 97A at 68.

## C. Restructuring to Eliminate Subsidiaries

GlenFed operated three subsidiaries [2] which in March 1990 it decided to divest. According to Plaintiffs, GlenFed announced that it had adopted a plan to discontinue operations with no aggregate net loss. Complaint ¶ 37 at 35. In order to obtain discontinued operations accounting treatment (and defer reporting losses on the subsidiaries), GlenFed was required to represent to its outside auditors that it intended to sell the three subsidiaries. *According to Plaintiffs,* Defendants knew that this was completely infeasible given the declining real estate economy and the *non-performing* assets held by the subsidiaries. A strategic plan presented at a September 25, 1990 GlenFed board meeting indicated that the discontinued operations might have to be liquidated rather than sold, resulting in an after-tax loss of $17 million. The plan indicated that the sale of GDC was not a viable alternative in the current market and that no buyers were capable of purchasing the other two subsidiaries except at fire sale prices. Almost contemporaneously, however, minutes of board meetings discuss an expected total of "three to five" bids for GDC as of August 31, 1990, and the receipt of "about eight to ten bids" for the finance subsidiaries and three offers for GDC (all unsatisfactory) by September 25, 1990. Complaint ¶ 48 at 40–41.

Plaintiffs point to the September 30, 1990 Form 10–Q which indicated that no net loss was expected on disposition by sale. Relying on an internal position paper, Plaintiffs also allege that the senior management Defendants deliberately delayed the losses from these subsidiaries until December 31, 1990, when the plan to sell them was publicly acknowledged to be infeasible and "discontinued operations" accounting treatment was terminated.

## D. Stock Price Decline

Plaintiffs' real complaint is that the Defendants portrayed GlenFed as able to with-

---

**2.** GlenFed Development Corporation (GDC), involved in commercial real estate development and investment, and GlenFed Capital Corporation (GCC) and GlenFed Financial Corporation (GFC), both involved in commercial lending backed by accounts receivable, inventory and fixed assets.

stand the recession and systemic problems in the thrift industry when in fact, "GlenFed was just another problem-plagued thrift riddled by systemic defects." Aplt. Brief at 8. According to Plaintiffs, the motive for this was to keep the stock price artificially inflated. "[A]s the truth about Glenfed's condition began to be revealed to the investing public, Glenfed's stock price plummeted from $21.375 on August 25, 1988 at the beginning of the Class Period to $4.624 on January 16, 1991 at the close of the Class Period." Aplt. Brief at 17; Complaint ¶ 114 at 85. (End of quote from 11 F.3d at 845–47.)

## DISCUSSION

### I

The district court dismissed plaintiffs' federal securities claims on account of plaintiffs' failure to comply with Fed.R.Civ.P. 9(b), which states:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

This court has repeatedly recognized, implicitly or explicitly, that Rule 9(b) applies to actions brought under the federal securities laws. *Neubronner v. Milken,* 6 F.3d 666, 671–72 (9th Cir.1993); *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989); *Deutsch v. Flannery,* 823 F.2d 1361, 1365 (9th Cir.1987); *Wool v. Tandem*

*Computers Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987); *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985); *Gottreich v. San Francisco Inv. Co.,* 552 F.2d 866, 866 (9th Cir.1977); *Walling v. Beverly Enters.,* 476 F.2d 393, 397 (9th Cir.1973).[3]

### A

■ Our first task is to determine whether we should adopt the Second Circuit's view that plaintiffs in securities fraud cases must plead facts giving rise to a "strong inference of fraudulent intent." We conclude that we should not. The second sentence of Rule 9(b) is very clear: "Malice, intent, knowledge, and other condition of mind may be averred generally." The model for Rule 9(b), Order 19, Rule 22 of the English Rules of Practice of 1937,[4] is clearer still:

> Wherever it is material to allege malice, fraudulent intention, knowledge, or other condition of the mind of any person, it shall be sufficient to allege the same as a fact *without setting out the circumstances from which the same is to be inferred.*

*The Annual Practice,* Order 19, Rule 22 (1937) (emphasis added). The Second Circuit's test is precisely the opposite of the English rule, and is irreconcilable with the second sentence of Rule 9(b). It also conflicts with authority from this circuit, most notably *Walling v. Beverly Enters.,* in which we stated that Rule 9(b) does not require "*any* particularity in connection with an averment of intent, knowledge or condition of the mind." 476 F.2d at 397 (emphasis added).[5]

---

3. We are aware of scholarly commentary which urges the opposite result (William M. Richman, Donald E. Lively & Patricia Mell, *The Pleading of Fraud: Rhymes Without Reason,* 60 S.Cal.L.Rev. 959, 977–79 (1987); Note, *Pleading Securities Fraud Claims With Particularity Under Rule 9(b),* 97 Harv.L.Rev. 1432 (1984)), and we note with interest the observation of amicus NASCAT that at one time this circuit appeared to have concluded that Rule 9(b) did *not* apply to actions brought under § 10(b) and Rule 10b–5. *Ellis v. Carter,* 291 F.2d 270, 275 n. 5 (9th Cir.1961). In the 33 years since *Ellis,* however, the law of this circuit has simply become too entrenched for us to revert to that position. And even if it had not, we are not free to override the clear language of Rule 9(b), which refers unequivocally to "fraud," and makes no distinction between common-law fraud and modern statutory causes of action

based on fraud. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (courts may not disregard the clear language of Rule 9(b) by applying the rule to civil rights claims against municipalities; such claims are simply not referred to in the rule).

4. *See* Notes of Advisory Committee on Rules, 1937 Adoption, Note to Subdivision (b).

5. We went on in *Walling* to reject defendant's argument that plaintiffs' complaint failed under Rule 9(b) because it set forth no facts showing defendant's state of mind, and we reversed the district court's dismissal of the complaint. *Id.*

   Defendants are correct that *Walling* involved "one-on-one fraud" rather than the "megafraud"

The Second Circuit's test may or may not have the effect of deterring or weeding out "strike suits," which various courts have seen as imposing undesirable social and economic costs. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978); *see also Semegen*, 780 F.2d at 731. Whether the test has such an effect is beside the point. We are not permitted to add new requirements to Rule 9(b) simply because we like the effects of doing so. This is a job for Congress, or for the various legislative, judicial, and advisory bodies involved in the process of amending the Federal Rules. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, —— U.S. ——, ——, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (courts may not impose a heightened pleading standard for civil rights claims against municipalities, which are nowhere mentioned in Rule 9(b); such a result "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation"). *Cf. Central Bank v. First Interstate Bank*, —— U.S. ——, ——, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994) ("The issue ... is not whether imposing private civil liability on aiders and abettors [of securities fraud] is good policy but whether aiding and abetting is covered by the statute").

■ Defendants argue that even if this circuit does not follow the Second Circuit in requiring a "strong inference" of scienter, we should, and in fact already do, require that plaintiffs allege facts giving rise to *some* inference of scienter. Defendants refer us to

*Greenstone v. Cambex Corp.*, 975 F.2d 22 (1st Cir.1992), where Judge Breyer, writing for a unanimous panel, stated that "[t]he courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Id.* at 25 (emphasis in original).

Defendants would have us read too much into this language. Sensibly read in conjunction with Rule 9(b), it means no more than this: when a complaint alleges with particularity the circumstances constituting fraud, as required by the rule, then generally it will also have set forth facts from which an inference of scienter could be drawn. We have no quarrel with such a formulation. *See infra* at pp. 1548, 1549. If, however, the First Circuit's formulation is read, as defendants would have it, to mean that Rule 9(b) contains an *independent* requirement that the complaint allege with particularity facts giving rise to an inference of scienter—which we would take to mean alleging such things as that defendants had read or otherwise knew about particular documents giving rise to an inference that the charged statements were false when made—then we decline to adopt it. We find no more justification for a "some inference" test than we did for the Second Circuit's "strong inference" test. It conflicts both with the English rule which was the model for Rule 9(b) and with the second sentence of Rule 9(b) itself, which declares unequivocally that state of mind may be averred generally, and says absolutely nothing about required inferences.[6]

of the modern fraud-on-the-market securities fraud class action. But since the issue before us is essentially one of statutory interpretation, this difference in factual circumstances is of little assistance to defendants.

**6.** Nor do we believe that the "some inference" test finds support in the cases from this circuit cited by defendants. In *In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir.1993), we affirmed the district court's dismissal of plaintiffs' securities fraud action because plaintiffs had failed to identify any actionable misrepresentations—not because they had failed to plead fraud with particularity. Rule 9(b) was not even mentioned in the opinion. Nor was Rule 9(b) mentioned in *Robertson v. Dean Witter Reynolds*, 749 F.2d 530, 541 (1984), where the court remanded after noting

that plaintiff had "chose[n] not to plead any facts from which scienter could be inferred." Since a major issue in *Robertson* was whether there is *any* scienter requirement in a claim brought under 17 C.F.R. 240.10b–16, *id.* at 539–41, it appears that plaintiff did not even *allege* scienter. *See id.* at 539. After determining that plaintiff did have an obligation to do so, *id.* at 540, the court examined the complaint and found no facts giving rise to an inference of scienter. But nothing in the court's observation precluded plaintiff, on remand, from averring knowledge "generally," as permitted by the second sentence of Rule 9(b).

In *Neubronner v. Milken*, we affirmed the district court's dismissal on the basis of plaintiff's failure to comply with Rule 9(b). But again, we

We conclude that plaintiffs may aver scienter generally, just as the rule states—that is, simply by saying that scienter existed.

### B

■ To determine the sufficiency of the complaint in this case, we must decide whether it avers with particularity the "circumstances constituting fraud," as required by the first sentence of Rule 9(b). According to plaintiffs, as they advanced their position at argument, those circumstances are simply the "facts necessary to identify the transaction" complained of.

We cannot accept plaintiffs' position as to the first sentence any more than we could accept defendants' invitation to undo the second sentence of Rule 9(b) in an effort to advance certain policy goals. Plaintiffs argue essentially that the only function of Rule 9(b) is to furnish defendants with notice. Plaintiffs thereby collapse Rule 9(b) into Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (Rule 8(a) requires a statement "that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"). But Rule 9(b) clearly imposes an *additional* obligation on plaintiffs: the statement of the claim must *also* aver with particularity the circumstances constituting the fraud. *See* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1297, at 615 (1990) (Rule 9(b) "is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules. . . ."). Rule 9(b) would clearly be superfluous if its only function were to ensure that defendants are provided with that degree of notice which is already required by Rule 8(a).

The language of Rule 9(b) itself reveals that it is more than simply a reiteration of requirements stated elsewhere. Rule 9(b) requires particularized allegations of the circumstances *constituting* fraud.[7] The time,

did not do so on the grounds that plaintiff failed to identify facts giving rise to an inference of scienter. Rather, with respect to plaintiff's misrepresentation claim, we noted that plaintiff had failed to attribute any false or misleading statement to defendant. 6 F.3d at 673. With respect to plaintiff's insider trading claim, we observed that plaintiff "did *not* allege specifically what information [defendant] obtained, when and from whom he obtained it, and how he used it for his own advantage." *Id.* at 672 (emphasis in original). Hence we concluded that "[t]he complaint offers no specific facts demonstrating wrongdoing which [defendant] could deny or otherwise controvert." *Id.*

In *Deutsch v. Flannery*, similarly, we emphasized Rule 9(b)'s function in providing a securities fraud defendant with notice. 823 F.2d at 1365–66. We did note that plaintiff had "provided support for his allegation that defendants knew of" an alleged misrepresentation, *id.* at 1365, but we offered this observation in order to demonstrate that plaintiff had cured what a district court *within the Second Circuit* had identified as a deficiency in a related claim plaintiff had filed there.

Finally, defendants cite *SEC v. The Seaboard Corp.*, 677 F.2d 1315 (9th Cir.1982), where, in affirming a district court's dismissal of a cross-claim, this circuit noted that the cross-complaint "failed to allege any *facts demonstrating knowledge* and participation sufficient to impose liability on defendant." *Id.* at 1316 (emphasis added). The defect in the complaint in *Seaboard*, however, as explained in the district court order quoted by this court, went much deeper than that. The cross-claimant had failed to allege anything more than that the defendant bank was the repository of an account through which the primary defendant conducted allegedly fraudulent sales of securities; thus the complaint " 'contained no allegations whatsoever concerning any alleged conduct of [the bank]' . . . [and] no allegations of 'specific wrongdoing, misconduct, or failure to act' " on the part of the bank. *Id.* (quoting district court). In other words, the complaint failed entirely to allege *wrongdoing*—with or without particularity. In this context, failure to allege facts demonstrating knowledge is incidental. To the extent that *Seaboard* may be construed as requiring a demonstration of knowledge, it is inconsistent both with Rule 9(b) and with our straightforward application of that rule in *Walling*, and we decline to follow it.

7. Judge Norris, in his concurring opinion at page 1558, cites Moore for the principle that "Rule 9(b) does not require or legitimate the pleading of detailed evidentiary matter." However, Moore's 2d Ed.1994 § 9.03 at 9–19–21 states "Generally, a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." "Evidentiary facts" as defined in Black's Law Dictionary are facts necessary for determination of ultimate facts. Rule 9(b) requires particularity as to the circumstances of

place, and content of an alleged misrepresentation may identify the statement or the omission complained of, but these circumstances do not "constitute" fraud. The statement in question must be false to be fraudulent. Accordingly, our cases have consistently required that circumstances indicating falseness be set forth. Thus in *Wool v. Tandem Computers,* we reversed the district court's dismissal pursuant to Rule 9(b) because we found that the complaint specified, *inter alia,* "the *manner* in which [the] representations [at issue] were false and misleading." 818 F.2d at 1440 (emphasis added). In *Moore v. Kayport Package Express,* we observed that plaintiff must include statements regarding the time, place, and *nature* of the alleged fraudulent activities, and that "mere conclusory allegations of fraud are insufficient." 885 F.2d at 540. Similarly, in *Semegen v. Weidner,* we held that it was insufficient to "set forth conclusory allegations of fraud ... punctuated by a handful of neutral facts." 780 F.2d at 731. And in *Blake v. Dierdorff,* 856 F.2d 1365 (9th Cir.1988), we required plaintiffs to set forth "specific descriptions of the representations made, [and] *the reasons for their falsity." Id.* at 1369 (emphasis added). To allege fraud with particularity, a plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading. A plaintiff might do less and still identify the statement complained of; indeed, the plaintiff might do less and still set forth some of the circumstances of the fraud. But the plaintiff cannot do anything less and still comply with Rule 9(b)'s mandate to set forth with particularity those circumstances which *constitute* the fraud.

In certain cases, to be sure, the requisite particularity might be supplied with great simplicity. At argument, counsel for plaintiffs hypothesized that a plaintiff might allege that he bought a house from defendant, that defendant assured him that it was in perfect shape, and that in fact the house turned out to be built on landfill, or in a highly irradiated area; plaintiff could simply set forth these facts (presumably along with time and place), allege scienter in conclusory fashion, and be in compliance with Rule 9(b). We agree that such a pleading would satisfy the rule. Since "in perfect shape" and "built on landfill" are at least arguably inconsistent, plaintiff would have set forth the most central "circumstance constituting fraud"—namely, that what defendant said was false. Notably, the statement would have been just as false when defendant uttered it as when plaintiff discovered the truth. The house was *always* defective because it was *always* built on landfill.

What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.[8] In the face of

---

the fraud—this requires pleading facts that by any definition *are* "evidentiary": time, place, persons, statements made, explanation of why or how such statements are false or misleading.

**8.** Courts have been quick to recognize this. *Denny v. Barber,* 576 F.2d 465, 469–70 (2d Cir.1978) (Friendly, J.) (where bank's fortunes declined because of, *inter alia,* the 1970's oil embargo and

New York City's near-bankruptcy in 1975, plaintiff's contention that defendants should have disclosed the downturn in the company's fortunes earlier was insupportable; plaintiff could not allege "fraud by hindsight"); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.) (plaintiff may not simply allege that the difference between a company's earlier statements of good health and

such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made*. This can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants.[9] The contemporaneous existence of such statements may support an inference of scienter, but that is *not required* under Rule 9(b).

Between these two extremes—cases like the "landfill" hypothetical, in which falseness is clear from the facts that had existed all along and were later revealed, and cases in which, because of an intervening event, contemporaneous falseness cannot be explained merely by pointing to later inconsistent statements or conditions—lies a third category. There may be situations in which what separates the allegedly fraudulent statement and the later, apparently inconsistent statement is an event internal to the company, such as the revaluation of assets, or the recalculation of loan loss reserves. In such a situation, explanation as to why the statements were false when made might be provided simply by pointing to the later statements—but without additional explanation the mere existence of the later statements might not be enough. The internal event might have been a response to an external event: for example, assets may have been revalued in light of market fluctuation. If so, plaintiff would generally be required to elaborate circumstances contemporary to the alleged false statement to explain how and why the statement was misleading when made.

The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily amount to an explanation as to why the earlier statement was false. For example, both the valuation of assets and the setting of loan loss reserves are based on flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure. In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.[10] Here too, plaintiff may need to draw on contemporaneous statements or conditions to make that demonstration. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir.1993) (plaintiffs state securities fraud claim where, in addition to alleging that defendants failed to disclose the need for a dramatic increase in loan loss reserves, they point to specific loans which were in jeopardy throughout the class period). Setting forth contemporaneous statements or conditions may well have the incidental effect of causing plaintiff to allege circumstances from which scienter can be inferred. But again, that is *not a requirement* under Rule 9(b).

## II

## A

Now focusing on the complaint in this case, we reluctantly conclude that despite its many deficiencies, it meets the requirements of Rule 9(b).

later statements of failing health "must be" attributable to fraud), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *see also Greenstone*, 975 F.2d at 25–26 (mere fact that company was eventually sued does not mean that defendants acted fraudulently in omitting to reveal this fact before the lawsuit was filed).

9. This is not to say that a plaintiff might not find other ways to explain why a statement was false when made. A later statement by the defendant along the lines of "I knew it all along" might suffice. *See Greenstone*, 975 F.2d at 26–27 (rapid settlement of a suit against defendants might indicate that defendants anticipated the suit at a time when, according to plaintiff, its imminence ought to have been disclosed).

10. *See Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 100 (3d Cir.1983) (in affirming dismissal of complaint under Rule 9(b), court explains that estimates of loan loss reserves "could be fraudulent only if, when established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices. *What those practices were and how they were departed from is nowhere set forth*") (emphasis added), *cited in Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 284–85 (3d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).

Measuring the adequacy of the 113–page complaint against those requirements is not a task for the short-winded. The complaint's satisfaction of the requirements of Rule 9(b) is marginal. Our determination of its adequacy is based on the following.

■ Plaintiffs allege that defendants made materially misleading statements regarding the disposition of GlenFed's subsidiaries. Plaintiffs point to a statement made in GlenFed's September 30, 1990 Form 10–Q assuring the SEC and investors that GlenFed expected no net loss on the sale of its subsidiaries. Complaint ¶ 50 at 42. Plaintiffs contrast this with contemporaneous statements, made at board meetings, indicating that the environment for the sale of a real estate development company (such as GDC, GlenFed's real estate development subsidiary) was "particularly unfavorable"; that interest in buying GDC was "very limited"; and that all bids had been unsatisfactory. Complaint ¶ 48 at 40–41. At the same time, according to plaintiffs, GlenFed's Strategic Plan *assumed* that the subsidiaries would be liquidated at a loss of $17 million, rather than sold at book value. Moreover, according to plaintiffs, a position paper described in the complaint and apparently prepared as part of the Strategic Plan observed that abandoning the treatment of the subsidiaries as discontinued operations—favorable accounting treatment which was available only if the sale of the subsidiaries was feasible—would "raise an issue with [GlenFed's outside auditors] and SEC once they become aware of what is occurring." Complaint ¶ 53 at 43–44. The position paper concluded that "it would not be prudent" to abandon that treatment until December 1990. *Id.*

By means of these contemporaneous statements, plaintiffs have set forth, in a specific manner, the reasons why the charged statements are alleged to be false when made. Our conclusion that they have thereby complied with the requirements of Rule 9(b) is not altered by the fact that other contemporaneous statements set forth in the complaint may point the opposite way. We note that at the same time that the authors of GlenFed's Strategic Plan observed that the sale of GDC was "not viable," Complaint ¶ 49 at 42, one of the director defendants reported to the board that an offer had been made to purchase GDC for $10 million below book value, and that GlenFed's investment banker "believe[d] the bidder would be willing to raise this offer to an acceptable level." Complaint ¶ 48 at 41. Whether or not, in light of contemporaneous statements which appear to conflict with one another, the charged statement was in fact materially misleading is a critical question. But it is one to be pursued at the summary judgment stage or conceivably in the context of a Rule 12(b)(6) motion—not in the context of determining compliance with Rule 9(b). We do not test the evidence at this stage.

■ Moving to plaintiffs' more global allegations—those concerning misrepresentations as to the adequacy of internal controls and loan loss reserves—we are satisfied that even here, despite many instances of deficient pleading discussed below, plaintiffs have supplied enough particularity to meet the requirements of Rule 9(b). Plaintiffs allege that in July 1990, six months before the dramatic increase in loan loss reserves, and at a time when defendants were still stating publicly that GlenFed was "secure and healthy" and employed strategies which "mandate that [the bank] continue to maintain [its] superior asset quality," Complaint ¶ 106 at 75, 77, non-public documents inside GlenFed revealed a lack of control. By pointing to these documents, plaintiffs are able to supply a modicum of particularity. According to plaintiffs, GlenFed's Internal Audit Department noted in June 1990 "that both the adequacy of and adherence to internal controls, policies and procedures need improvement, including the monitoring of loans to one borrower ... [which] present special risks...." Complaint ¶ 123(c) at 91–92. In August 1990, a proposal submitted by the accounting firm Deloitte & Touche listed the following as "Management's concerns":

"(1) Internal monitoring process needs to be strengthened, (2) The commercial real estate loan portfolio data base may not be completely accurate, (3) Reporting and information needs to be improved."

Complaint ¶ 123(g) at 93 (quoting proposal). These observations by GlenFed's manage-

ment are consistent with plaintiffs' allegations that GlenFed's appraisals of the collateral securing its loans were outdated, and in many cases were more than two years old. Complaint ¶ 122A at 94–99. As GlenFed later explained to its employees, and as seems clear even without such explanation, outdated appraisals in declining markets can conceal risk of loss, since they do not reflect the true diminished value of the collateral. *Id.* at 96. Plaintiffs provide lists of specific loans which, at June 30, 1990 and December 31, 1990, had not undergone appraisal in more than two years. *Id.* Plaintiffs then seek to tie the eventual updating of appraisals to significant increases in loan loss reserves. Complaint ¶¶ 124–25 at 99.

These allegations, buried nearly 100 pages into the complaint, are, we believe, sufficient under Rule 9(b). Plaintiffs have set forth specific facts and specific statements, made by or attributed to the defendants, which appear to conflict with defendants' public statements (in the case of internal controls), or (in the case of loan loss reserves) which are alleged to reveal that GlenFed's statements, even if literally true, failed to reflect the true condition of the bank, thereby misleading investors. *See Wells Fargo,* 12 F.3d at 926 (shareholders state a claim where they "allege that [the bank's] statements of its loan loss reserves failed to disclose—i.e., failed to reflect—certain loans that the bank knew were 'in jeopardy' "). In the paragraphs just cited, plaintiffs have done more than merely allege that everything defendants stated publicly was false. Rather, plaintiffs have pointed to specific problems which they allege undermined defendants' optimistic claims: aged appraisals which concealed risk of loss; inaccuracies in the commercial real estate portfolio data base; inadequate controls on single-borrower loans. Thus this case, like *Wells Fargo,* is distinguishable from those cases decided under Rule 9(b) in which plaintiffs stated simply that defendants' public statements were false, without explaining *how* they were false. *Compare Wells Fargo,* 12 F.3d at 926–28 (plaintiffs point to specific problem loans and allege that bank's non-performing assets and reserves were understated because defendants failed to account for defaults and

doubtful collectibility of these loans) *with DiLeo v. Ernst & Young,* 901 F.2d 624, 626 (7th Cir.) (plaintiffs did not "give examples of problem loans that [the accounting firm] should have caught, or explain how it did or should have recognized that the provisions for reserves established by [the bank's] loan officers were inaccurate"), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir. 1983) (complaint's "defect [was] the complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices").

### B

In the hope that we may spare litigants and courts some of the problems that this lawsuit has spawned so far, we describe in detail some of the many deficiencies of the complaint.

The bulk of the complaint is devoted to broad-ranging allegations that the defendants made materially misleading statements or omissions in order to conceal GlenFed's deteriorating financial condition (by suggesting that loan loss reserves were conservative when they were not, and by employing overly optimistic accounting standards) and GlenFed's lack of internal controls (by stating that controls were rigorous when in fact assets were not properly monitored and loan underwriting policies were lax). With respect to these claims, if this were all that the complaint contained, it would fall short of compliance with Rule 9(b).

A major vice of the complaint is that at many points it fails entirely to specify "the manner in which [the] representations [at issue] were false and misleading." *Wool,* 818 F.2d at 1440. The following passages are typical:

72. In the 1988 Annual Report, the Director Defendants attempted to distinguish GlenFed and the Bank from savings and loans which had performed poorly by touting:

.        .        .        .        .

(b) the highly conservative nature of GlenFed's internal policies and procedures for origination and monitoring of loans and GlenFed's safe and conservative strategy for establishing loan loss reserves—while ignoring the absence of adequate controls and reliable information to formulate such statements and discounting that information readily available within GlenFed reflecting increasing foreclosures and defaults....

.    .    .    .    .

89. The [defendants' public statements] regarding the $30 million increase to the Bank's loan loss reserves were materially misleading because they conveyed the false impression that the Bank conservatively reserved for possible loan losses, when, in fact, GlenFed and the Director Defendants knew or recklessly disregarded that $30 million was not a conservative addition to the loan loss reserve, and that further reserves were warranted. Moreover, despite the statement that the addition "was not the result of any specific loss situations," the Director Defendants knew or were reckless in not knowing that loans not listed as non-performing, and therefore not reserved, should have been so categorized, necessitating a substantial further reserve addition.

.    .    .    .    .

92(b) [The Second Quarter 1990 10–Q] materially understated the amount of the non-performing loans in Florida and falsely portrayed the increase in such loans as being limited to specific borrowers, rather than to the economic down turn in Florida—which the Director Defendants, several of whom resided and operated businesses in that state, knew or should have known would require an increase in the Bank's loan loss reserves to adequately provide for increasing non-performing loans.

Complaint at 53, 61–62, 65. In these paragraphs, the plaintiffs merely proclaim in the most conclusory fashion that the defendants made false statements. The statements are identified, and their falseness is alleged, but "the reasons for their falsity," *Blake*, 856 F.2d at 1369, are not set forth. In ¶ 72(b),

the plaintiffs do not explain which internal controls are missing, why the information defendants purportedly used as a basis for their optimistic statements was unreliable, or what information within GlenFed revealed that foreclosures and defaults were increasing. With respect to ¶ 89, the plaintiffs do not explain why, at the relevant time, $30 million was not a "more conservative" loan loss figure, nor which "specific loss situations" the defendants were concealing. In ¶ 92(c), the plaintiffs fail to identify or quantify the number of non-performing assets (NPA). Plaintiffs simply state that the level of NPA was rising. Given these allegations of falseness, which are not particular but rather conclusory in the extreme, we sympathize with defendants' observation that the drafters of the complaint often seem to have done little more than copy verbatim language from GlenFed's public filings, and then proclaim at more or less regular intervals that the statements were false.

■ In many instances, plaintiffs try to get around the dearth of contemporaneous indications of falseness by simply pointing to later corrective actions on the part of the defendants. For example, plaintiffs allege that

The failure to establish adequate internal controls to properly manage GlenFed ... is indicated by the current reorganization program, which GlenFed states is designed to "improve reporting lines, reduce management layers and improve management's control." .... [T]he Senior Management Defendants' stated need to improve control demonstrates that ... GlenFed lacked controls and that this was known or recklessly disregarded by the Director Defendants.

Complaint ¶ 35 at 34. In much the same vein, plaintiffs state, in connection with their allegation that defendants failed properly to classify many loans as in-substance foreclosures, that "[a]s evidence of in-substance characteristics [of the loans] ... seven of the 62 loans were *subsequently* foreclosed...." Complaint ¶ 110A(d) at 83 (emphasis added). Similarly, plaintiffs state that

... the initiation of the comprehensive reviews of GlenFed's internal policies and procedures for monitoring credit quality was an implicit recognition that the policies had not kept pace with GlenFed's expansion and were in need of drastic modification prior to examination by the FDIC. Complaint ¶ 121 at 90.

None of this is sufficient. The fact that policies may change over time does not mean that an earlier policy is inadequate, or that statements regarding its adequacy are falsehoods. Plaintiffs' allegations concerning corrective actions taken by defendants do not, without more, explain how statements concerning the company's good health, made before those actions were taken, were false when made.

Even when plaintiffs do point to specific contemporaneous statements or conditions to demonstrate the falseness of the charged statements, the connection is often elusive or illusory. For example, plaintiffs allege that in July 1990 the Office of Thrift Supervision conducted an examination of the bank's real estate assets, and that in response to a report subsequently prepared by OTS, the bank agreed to do an annual audit of its internal asset review system. Complaint ¶ 123(a) at 91. At most, plaintiffs have made an innuendo of inadequacy on the basis of a bald assertion that later, some different action was taken. Such innuendos are insufficient. More importantly, the action taken by defendants—agreeing to do an annual audit—is simply not matched up with an allegedly fraudulent statement. The same holds true for plaintiffs' next allegation regarding a contemporaneous statement: "The Internal Audit Department noted that some of the data processing control concerns noted in 1989 still existed and involved significant risks to the Bank." Complaint ¶ 123(b) at 91. The finding by the audit department is not linked to any purportedly fraudulent statement on the part of defendants. Plaintiffs can hardly hope to satisfy Rule 9(b) when they do not connect the "circumstances" required by that rule with any purported misrepresentation.[11]

Plaintiffs also fall short of compliance with Rule 9(b) when they allege contemporaneous (and ostensibly contradictory) conditions in such broad terms that defendants are given inadequate notice of the falsehood they are charged with. For example, plaintiffs allege that GlenFed's 1990 Annual Report was misleading because it failed to disclose "the true level of risks inherent to the Bank's outstanding loans in depressed real estate markets, such as Florida." Complaint ¶ 108(a) at 79. Because there is no indication of what the "true" level of risks was, defendants are largely left in the dark as to the nature of their purported falsehood. Similar explanatory shortfalls are apparent in, e.g., ¶ 43, where plaintiffs allege that GlenFed "engaged in overly liberal accounting practices," without setting forth how GlenFed violated the rules which are cited, and in ¶ 62, where plaintiffs allege that "GlenFed's position with respect to goodwill is wholly inconsistent with conservative accounting practice," without explaining which principles were violated (or, indeed, where defendants ever said that they subscribed to "conservative" accounting practice).

These various discrete deficiencies are not the only problems with the complaint. The complaint is unwieldy in the extreme. It is 113 pages long, and often rambles through long stretches of material quoted from defendants' public statements (many of which seem innocuous enough even by plaintiffs'

---

11. When plaintiffs do match allegedly fraudulent statements with contemporaneous statements or conditions designed to point up their falsity, the match is often imperfect. Examples are legion. E.g., Complaint ¶ 29(b) at 27 (alleging that defendants described NPA as among the lowest in the industry, but that information within GlenFed's files indicated that the level of NPA was rising); Complaint ¶ 75 at 54 (alleging that defendant Coulson stated that the bank had continued to "emphasize personal savings" as its business purpose, but that GlenFed had "aggressively" expanded into commercial real estate loans); Complaint ¶¶ 90, 92(a) at 62, 65 (alleging that the Second Quarter 1990 10–Q states that GlenFed's Asset/Liability Management Committee analyzes the sensitivity of the company's earnings and capital to interest rate changes, but that the 30–day reaction time used by the Committee was insufficient to materially adjust risk and avoid increased losses). None of these pairings contains an explanation as to how the charged statements were false when made.

recounting) unpunctuated by any specific "reasons for falsity"—which, indeed, prove difficult to locate in the surrounding area. This is, at the very least, poor draftsmanship. It is impossible to overlook the fact that the organization of the complaint often makes the nature of the fraud difficult to divine, and certainly makes the complaint difficult to respond to. At argument, plaintiffs' counsel, when pressed on the sufficiency of individual paragraphs, responded that each was merely "a piece of this puzzle." A complaint is not a puzzle, however, and we are loathe to allow plaintiffs to tax defendants, against whom they have levelled very serious charges, with the burden of solving puzzles in addition to the burden of formulating an answer to their complaint.

We trust that our vacation of the panel's decision will not be construed as an expression of satisfaction with the complaint in this case. To say that the drafting is infelicitous puts matters too kindly. The complaint is cumbersome almost to the point of abusiveness. We see nothing to prevent the district court, on remand, from requiring, as a matter of prudent case management, that plaintiffs streamline and reorganize the complaint before allowing it to serve as the document controlling discovery, or, indeed, before requiring defendants to file an answer. Complaints fashioned as this one is are an unwelcome and wholly unnecessary strain on defendants and on the court system.

Nevertheless, we conclude that by virtue of those discrete portions of the complaint which we have cited, the complaint does satisfy the requirements of Rule 9(b). Much as we might be tempted, given the complaint's many deficiencies, to affirm the district court and the panel, we cannot make Rule 9(b)

carry more weight than it was meant to bear. Rule 9(b) does not require that the complaint set forth facts giving rise to an inference of scienter, nor that it furnish a detailed exegesis of how the defendants came by the knowledge of those facts which belie their statements. Rule 9(b) requires only that the circumstances constituting fraud—except, of course, for scienter—be set forth with particularity. Despite its many shortcomings, the complaint in this case complies with that requirement. We therefore vacate the panel's opinion.

Before this case returns to the district court, however, we first return it to the original panel so that the panel may reconsider, in light of our opinion, its holdings concerning secondary liability[12] and plaintiffs' 1933 Act and state-law claims. We vacate the panel's decision at 11 F.3d 843, and remand to the panel for further proceedings consistent with this opinion.

**VACATED AND REMANDED.**

WILLIAM A. NORRIS, Circuit Judge, concurring, joined by BEEZER, CYNTHIA HOLCOMB HALL and RYMER, Circuit Judges, as to Parts I & III:

I agree with the majority that Rule 9(b) does not require plaintiffs to plead facts giving rise to an inference of scienter. I write separately, however, for two reasons: (1) to respond to the concerns of our sister circuits that have read an inference of scienter test into 9(b), and (2) to express my own concern that the majority's discussion of the particularity requirement of 9(b) destabilizes settled Ninth Circuit law by effectively reading into the Rule a requirement that plaintiffs plead facts giving rise to an inference of falsity.[1]

---

**12.** The panel addressed under the heading of secondary liability defendants' argument that the complaint was insufficient in attributing certain statements to all of the defendants as "group published information." 11 F.3d at 849 (citing *Blake*, 856 F.2d at 1369). Defendants, however, have at times raised this argument in the context of primary liability. The panel may, if it chooses, reconsider this argument as a basis for dismissal under Rule 9(b) with respect to primary liability. Because the issue has not been briefed or argued before us, however, we decline to reach it.

The panel's reconsideration of secondary liability must also take into account the Supreme

Court's intervening decision in *Central Bank v. First Interstate Bank*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

**1.** I believe it was unnecessary and imprudent for the majority to reach the issue whether the allegations of falsity satisfy the particularity requirements of the first sentence of Rule 9(b). The issue was not reached by the original panel, which affirmed the district court's dismissal of the second amended complaint solely on the ground that the plaintiffs failed to plead scienter with sufficient particularity. It never reached the issue of the sufficiency of the falsity allega-

## I

The First, Second and Seventh Circuits have all held that Rule 9(b) requires that plaintiffs in securities fraud cases plead a factual basis for allegations of fraudulent intent. *See Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992) ("The courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint *also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading.") (emphasis in original); *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990) ("Although scienter need not be alleged with great specificity, plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent.") (citations omitted); *DiLeo v. Ernst & Young,* 901 F.2d 624, 629 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ("[T]he complaint ... must afford a basis for believing that plaintiffs could prove scienter.").

I respect the concerns that animated this expansive interpretation of Rule 9(b) by the First, Second and Seventh Circuits. As Chief Judge Newman, writing for the Second Circuit, observed, in securities fraud cases,

> there is [an] interest in deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal, even though no recovery would occur if the suit were litigated to completion.

*In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 263 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *see also Greenstone,* 975 F.2d at 25; *DiLeo,* 901 F.2d at 627. The Supreme Court expressed similar concerns in an earlier securities fraud case:

> [T]o the extent that [discovery] permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit.

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975). Notwithstanding these legitimate concerns about nuisance actions based upon the *in terrorem* effect of discovery costs in complex security fraud cases, I believe that the language of 9(b) cannot and should not be construed as requiring the pleading of facts that give rise to an inference of scienter. Not only does such a construction do violence to the plain meaning of the second sentence of 9(b), I believe it does unnecessary violence to the fundamental tenets of notice pleading.

As a radical departure from basic principles of our notice pleading system, an inference of scienter test inevitably contributes to the plague of burdensome and prolix complaints that have become fashionable in securities fraud cases today. Here, for example, the second amended complaint contains over 100 pages of painstakingly detailed allegations of evidentiary facts. This level of detail is typical of the modern securities fraud complaint. While I deplore such a radical departure from Rule 8's command of "simple, concise, and direct" pleadings, it is inevitable that prudent lawyers, faced with the obstacle of an inference of scienter test at the pleading stage, will throw into their complaints every scrap of evidence they can muster. Not surprisingly, securities fraud complaints now commonly read more like summary judgment papers than pleadings designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged...." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985).

Rule 9(b) need not and should not be read as clashing with Rule 8's requirement of a short and plain statement of plaintiff's claim. Rather, since the promulgation of the Federal Rules, courts have stated that the requirements of Rule 9(b) must be harmonized with the basic principles of notice pleading embodied in Rule 8. *See, e.g., Craighead v. E.F. Hutton,* 899 F.2d 485, 491 (6th Cir.1990);

tions under 9(b). Nor was that issue briefed or argued to the en banc court.

*Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1362 (10th Cir.1989); *Friedlander v. Nims,* 755 F.2d 810, 813 (11th Cir.1985); *Simcox v. San Juan Shipyard, Inc.,* 754 F.2d 430, 439–40 (1st Cir.1985); *Credit & Finance Corp. v. Warner & Swasey Co.,* 638 F.2d 563, 566 (2d Cir.1981); *Felton v. Walston & Co.,* 508 F.2d 577, 581 (2d Cir.1974); *Hirshhorn v. Mine Safety Appliances Co.,* 54 F.Supp. 588, 591 (W.D.Pa.1944); *United States v. Kralmann,* 3 F.R.D. 473, 474–75 (E.D.Ky.1943); 2A James Wm. Moore et al., *Moore's Federal Practice* ¶ 9.03[2] (2d ed. 1994).

Our circuit has harmonized Rules 8 and 9(b) by making it clear that "[r]ule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter." *Walling v. Beverly,* 476 F.2d 393, 397 (1973) (quoting 2A James Wm. Moore et al., *Moore Federal Practice* ¶ 9.03, at 1930 (2d ed. 1972)). In taking this approach, we followed the many courts that have, since the inception of the Federal Rules of Civil Procedure, consistently declared that the pleading of detailed evidentiary matter is unwarranted by the strictures of Rule 9(b) and inconsistent with the basic principles of notice pleading. *See, e.g., Seattle–First Nat'l Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir.1986); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 n. 20 (2d Cir.1979); *Brady v. Games,* 128 F.2d 754, 755 (D.C.Cir.1942); *Capalbo v. Paine Webber, Inc.,* 672 F.Supp. 1048, 1050 (N.D.Ill. 1987); *Hirshhorn,* 54 F.Supp. at 591; *Perrott v. United States Banking Corp.,* 53 F.Supp. 953, 957 (D.Del.1944); *Brown v. Fire Ass'n,* 1 F.R.D. 450, 450 (S.D.N.Y.1940); 2A Moore et al., *supra,* ¶ 9.03[1]; 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (1990).

Even though I join the majority in rejecting the inference of scienter test, I share the concerns of our sister circuits about the social costs of strike suits.[2] There is good reason to be concerned about such cases, many of which are brought by plaintiffs hoping to extract an early settlement based on the *in terrorem* effect of discovery costs. Too often, these cases are filed on the heels of a dramatic change in a corporation's stock price and are based on evidence no better than the announcement of an unexpected change in the financial condition of the corporation.

It is also true, however, that there are social costs associated with a rule of pleading that causes a proliferation of complaints that are chock full of allegations of detailed evidentiary matter. Not only are such pleadings burdensome for defendants to deal with, they are burdensome for judges who are required to comb through the evidentiary matter pleaded and struggle with the inferences it does or does not support as though the evidence were presented in affidavit form as required by Rule 56 rather than merely alleged in a complaint. This is a difficult and time-consuming process that judges must necessarily engage in at the summary judgment stage, but it is a wasteful use of judicial resources to require judges to engage in the same process at the pleading stage. *See, e.g., In re Time Warner,* 9 F.3d at 268–71 (sifting through evidence pleaded in complaint in search of inference of scienter); *Greenstone,* 975 F.2d at 26–27 (same); *Di-Leo,* 901 F.2d at 629–30 (same).

In my view, the social costs of reading an inference of scienter test into Rule 9(b) outweigh any incremental value of such a rule in screening out strike suits at the pleading stage.[3] As our court has written:

**2.** Some commentators have also advocated an inference of scienter test as a means of ferreting out factually baseless suits at the pleading stage. *See, e.g.,* Jared L. Kopel, Procedural Reforms, in *Securities Class Actions: Abuses and Remedies* 107 (Edward J. Yodowitz et al. eds. 1994); William C. Baskin III, Note, *Using Rule 9(b) to Reduce Nuisance Securities Litigation,* 99 Yale L.J. 1591 (1990).

**3.** The costs associated with rules that spawn the pleading of detailed evidentiary matter are borne not only by defendants and the courts, but also

by actual victims of securities fraud. When plaintiffs prevail in a securities class action, whether by settlement or adjudication, class counsel's fees are paid for out of the common fund created to compensate the members of the class for their losses. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1294–95 (9th Cir.1994). Any time spent by class counsel to create and then defend hundred-page complaints is ultimately paid out of the common fund, which means out of the pockets of the class members themselves. Thus, it is in the interests

The pleading rules, designed to avoid and reduce long and technical allegations, are necessarily supplemented by procedures including summary judgment which enable a party to have a judgment in a relatively short time if there is actually no bona fide claim presented. [The defendant] is at liberty to avail itself of these procedures and thereby seek to avoid what otherwise might be protracted litigation.

*Walling,* 476 F.2d at 397–98. In sum, it is unnecessary and counterproductive to refashion Rule 9(b) in response to the problem of strike suits when more cost efficient responses are available.

Pleading rules are no substitute for active case management by district court judges. The driving force behind securities fraud suits filed to extract early settlements disproportionate to the merits is the expectation that once plaintiffs get past the pleading stage, they will automatically gain access to virtually unlimited discovery. Once a defendant is faced with that daunting prospect, practical business considerations drive settlement values skyward. The inference of scienter test is designed to deal with this *in terrorem* effect of discovery costs by weeding out groundless cases at the pleading stage. Regrettably, however, it also helps spread the plague of prolix complaints.

In the notice pleading system that has served the federal courts so well, we must rely heavily on individual district judges to keep the costs of discovery under control. District judges have broad discretion and a range of tools that allow them to control the extent and timing of discovery as well as to test the plaintiffs' ability to prove their case prior to trial. District courts need not permit unlimited discovery simply because a plaintiff has managed to draft a complaint that satisfies the minimal requirements of Rules 9(b) and 12(b)(6). *See* Fed.R.Civ.P. 16, 26. Nor must they wait for trial to determine whether the complaint has been brought without any basis in fact. *See* Fed.

R.Civ.P. 11, 56. By exercising active control over the early stages of the litigation, district judges can dramatically reduce the *in terrorem* effect of discovery in complex security cases. Rather than adopting more stringent rules of pleading, we should be encouraging district judges to use their broad discretion to limit the ability of plaintiffs to extract undeserved settlements by confronting defendants with the prospect of exorbitant discovery costs.[4]

In sum, I believe that the second sentence of Rule 9(b) means what it says—scienter may be averred generally. I also believe that an inference of scienter test is counterproductive. Accordingly, I concur with the majority that the allegations of fraudulent intent in plaintiffs' second amended complaint easily comply with Rule 9(b). *See* Second Amended Complaint ¶¶ 29, 132, 153 (E.R. 26–30, 105, 110).

## II

I now turn to the majority's discussion of the particularity requirement of the first sentence of Rule 9(b). *See* Majority Opinion Parts I.B & II. I write separately on this issue solely to express my concern that the majority's discussion will be read as creating an inference of falsity test that parallels the inference of scienter test unanimously rejected by this en banc court. Like the inference of scienter test, an inference of falsity test clashes not only with the settled law of this circuit, but also with the basic principles of notice pleading.

Although the majority does not say that it is adopting an inference of falsity test, it appears to do just that by requiring the pleading of evidentiary facts giving rise to an inference that the allegedly fraudulent statements were false when made. The majority requires that plaintiffs *"explain how and why the statement was misleading when made." Id.* at 1549 (emphasis added). Thus, it is not enough for the plaintiff to explain

---

of both plaintiffs and defendants, as well as the courts and, ultimately, the taxpayers, to avoid the proliferation of prolix pleadings.

**4.** It may be that still additional reforms are necessary to deal with the problem. *See Securities*

*Class Actions: Abuses and Remedies* (Edward J. Yodowitz et al. eds., 1994). Amending the Federal Rules of Civil Procedure, however, is reserved for the rulemaking process and changes in the substantive law must be left to Congress.

"how"—i.e., in what respect—the statement was false. The majority requires a further explanation as to "why" it was false. The majority opinion makes clear that explaining "why" a statement was false requires that the plaintiffs "demonstrate the falseness of the charged statements." *Id.* at 1553; *see also id.* at 1549–50. The use of the word "demonstrate" is revealing. It shows that the majority requires plaintiffs to make a demonstration—i.e., prove by evidence—of falsity at the complaint stage. *See* Black's Law Dictionary 432 (6th ed. 1990) (defining "to demonstrate" as "[t]o show or prove value or merits by operation, reasoning, or evidence"). The majority even offers a suggestion as to the best type of evidence for plaintiffs to plead: "inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." Majority Opinion at 1549.

Notwithstanding the majority's disclaimer that "[w]e do not test the evidence at this stage," *id.* at 1550, Part II of the majority's opinion proceeds to do just that by examining whether or not the evidence pleaded in the complaint supports an inference that the challenged statements were false when made. For example, with regard to the subsidiaries claim, the majority reviews statements from Glenfed's Form 10–Q, Strategic Plan, and board minutes, weighing these pieces of evidence to see if they give rise to an inference of falsity. *Id.* at 1549–50. The majority's discussion ruminates on the proper evidentiary weight to be accorded each statement depending on whether or not it was made contemporaneously with the allegedly fraudulent statement. *Id.* at 1549–50.[5] Indeed, Part II of the majority's opinion reads like a summary judgment opinion rather than an opinion reviewing a 9(b) motion to dismiss.

In requiring plaintiffs to plead evidentiary facts that "explain why" or "demonstrate" that the allegedly false statements were in fact false when made, the majority opinion creates the unfortunate impression that it is modifying settled Ninth Circuit caselaw. Our seminal case interpreting Rule 9(b) is *Walling v. Beverly*, 476 F.2d at 393. In upholding the adequacy of the plaintiffs' complaint under 9(b), we adhered to the interpretation of 9(b) articulated by Professor Moore:

> Rule 9(b) requires that the circumstances constituting fraud must be stated with particularity. But "[r]ule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter." 2A J. Moore, *Federal Practice* ¶ 9.03, at 1930 (2d ed. 1972). Nor does Rule 9(b) require any particularity in connection with an averment of intent, knowledge or condition of the mind. It only requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations.

*Id.* at 397. Following Moore further, we held that the notice requirement of 9(b) was satisfied by allegations of "the time, place and nature of the alleged fraudulent activities." *Id; see also* 2A Moore et al., *supra,* ¶ 9.03[1].

Since *Walling,* our cases regarding the particularity requirement of the first sentence of 9(b) have continued to follow Moore, reiterating three basic principles:

1) Rule 9(b) does not require or legitimate the pleading of detailed evidentiary matter;[6]

---

5. Not only is such analysis inappropriate at the pleading stage, it is also misguided. Whether the statements were contemporaneous with the allegedly fraudulent statements is, for the most part, irrelevant as to whether the statements were in fact false. As the Majority Opinion itself demonstrates, the contemporaneity of evidence in a fraud case is much more probative of scienter than falsity. *See, e.g.,* Majority Opinion at 1548–49 ("[Explaining why a statement was false when made] can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) *which*

*were made by or available to the defendants.*") (emphasis added); *id.* at 1548–49 n. 8 ("This is not to say that a plaintiff might not find other ways to explain why a statement was false when made. A later statement *by the defendant* along the lines of '*I knew it all along*' might suffice. *See Greenstone,* 975 F.2d at 26–27.") (emphasis added). *Greenstone,* however, is a scienter case—it applies an inference of scienter test, not an inference of falsity test.

6. *See, e.g., Walling v. Beverly,* 476 F.2d at 397; 2A Moore et al., *supra,* ¶ 9.03[1].

2) A complaint satisfies 9(b) if it provides sufficient notice to the defendant of the particular acts that are alleged to be fraudulent so that the defendant can prepare an adequate answer;[7]

3) This notice requirement is satisfied by allegations of the time, place and specific content of the allegedly fraudulent statement, along with an identification of what in particular was false or misleading about the statement.[8]

None of our cases have stated anything about requiring a plaintiff to demonstrate falsity or anything else. Nor have any engaged in the summary judgment-like weighing of the evidence that the majority opinion undertakes.

Despite this, the majority presents its approach as consistent with circuit precedent. Majority Opinion at 1547–48. In imposing its requirement that plaintiffs plead "[facts that] amount to an explanation as to why the [disputed] statement was false," *id.* at 1549–50, the majority relies primarily on our statement in *Blake v. Dierdorff,* 856 F.2d 1365 (9th Cir.1988), that 9(b) requires "specific descriptions of the representations made, [and] *the reasons* for their falsity." *Id.* at 1369 (emphasis added). The majority, however, misinterprets our statement in *Blake*

and in the process strays from *Walling* and its progeny.

I read *Blake* the way I read our other cases: the plaintiff must set forth the allegedly fraudulent statements and explain *what is false about them.* In other words, *Blake* was merely restating, in slightly different form, the requirements that have been reiterated by our court time and again, the requirements that reflect Professor Moore's summary of the law. *See supra* n. 8. His statement of the rule is thus revealing:

the pleader is required to specify the time, place, and content of any allegedly false representation, *the fact misrepresented,* the identity of the perpetrator, and what was obtained or given up as a consequence of the fraud.

Moore et al., *supra,* ¶ 9.03[1] (emphasis added). There is no requirement of making any kind of demonstration, no need to state facts that "explain why" or otherwise substantiate the allegation of falsity.

In straying from the settled law of our circuit, the majority falls into the same trap that the other circuits fell into when they adopted an inference of scienter test: a rule of pleading that encourages, if not requires, the exhaustive pleading of evidentiary facts, spawning monstrous complaints such as the 800-pound gorilla we have been wrestling with in this case.[9] The majority's lesson to

7. *See, e.g., Kaplan v. Rose,* No. 92–55879, slip op. 12491, 12504 (9th Cir. Oct. 11, 1994); *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987); *Semegen v. Weidner,* 780 F.2d 727, 729 (9th Cir.1985).

8. *See, e.g., Kaplan v. Rose,* No. 92–55879, slip op. at 12504 ("time, place, and nature of the misleading statements"); *Moore v. Kayport Package Express, Inc.,* 885 F.2d 531, 540 (9th Cir.1989) ("time, place and nature of the alleged fraudulent activities"); *Blake v. Dierdorff,* 856 F.2d 1365, 1369 (9th Cir.1988) ("date ..., specific descriptions of the representations made, the reasons for their falsity, and, where possible, the roles of the individual defendants"); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1439 (9th Cir.1987) ("time, place and nature of the alleged fraudulent activities"); *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985) ("time, place and specific content of the false representation"); *Misc. Serv. Workers v. Philco–Ford Corp.,* 661 F.2d 776, 782 (9th Cir.1981) ("time, place and specific content of the false representations

as well as the identities of the parties to the misrepresentation"); *Gottreich v. San Francisco Investment Corp.,* 552 F.2d 866, 866 (9th Cir. 1977) ("the time, place and content of the false misrepresentation[s], the fact[s] misrepresented and what was obtained or given up as a consequence of the fraud") (quoting 2A J. Moore, *Federal Practice* ¶ 9.03, at 1927–1928 (2d ed. 1975)).

Early cases interpreting the new Federal Rules of Civil Procedure also followed this formulation. *See, e.g., United States v. Hartmann,* 2 F.R.D. 477, 478 (E.D.Pa.1942) (holding that "the circumstances constituting the fraud means merely the time, place and content of the false representation, the fact misrepresented, and an identification of what has been obtained").

9. Just imagine trying to draft an answer to this complaint. Responding to each evidentiary allegation would be the functional equivalent of responding to a request for admissions—even before a discovery conference has been held and the scope of discovery defined by the district judge.

securities fraud practitioners is that if the evidentiary facts they plead are deemed "insufficient," they risk dismissal under 9(b). Careful lawyers will ignore the language of the opinion admonishing the plaintiffs for their lengthy complaint and plead as much evidence as they can muster to make a "demonstration" of falsity.

While the majority has avoided the pitfalls of an inference of scienter rule, the second part of its opinion may create just as much mischief as the rule it has rejected.

### III

I concur in the judgment to the extent it vacates the decision of the original panel dismissing the second amended complaint for failure to plead facts giving rise to an inference of scienter.